**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| **WODA COOPER DEVELOPMENT, INC.;** | ) | |
| **PARALLEL HOUSING, INC.; PERKINS FIELD** | ) | |
| **LIMITED PARTNERSHIP; and PARALLEL** | ) | |
| **PERKINS FIELD DEVELOPMENT, LLC** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. _____** |
| | ) | |
| **THE CITY OF WARNER ROBINS, GEORGIA, and** | ) | |
| **THE DEVELOPMENT AUTHORITY FOR THE** | ) | |
| **CITY OF WARNER ROBINS, GEORGIA** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**COMPLAINT FOR BREACH OF CONTRACT, FOR VIOLATION OF FAIR HOUSING**</u>
<u>**OBLIGATIONS, FOR SPECIFIC PERFORMANCE, FOR VIOLATION OF SECTION**</u>
<u>**1983, AND FOR PURSUING LITIGATION IN BAD FAITH ENTITLING RECOVERY**</u>
<u>**OF ATTORNEYS FEES**</u>

  **COME NOW PLAINTIFFS WODA COOPER DEVELOPMENT, INC.** ("Woda Cooper"), **PARALLEL HOUSING, INC**. ("Parallel Housing"), **PERKINS FIELD LIMITED PARTNERSHIP** ("Perkins L.P.") and **PARALLEL PERKINS FIELD DEVELOPMENT, LLC** ("Perkins LLC") (collectively, the "Plaintiffs"), by and through counsel, and for their Complaint against the Defendants, **CITY OF WARNER ROBINS, GEORGIA** (the "City" or "Warner Robins") and **THE DEVELOPMENT AUTHORITY FOR THE CITY OF WARNER ROBINS, GEORGIA** (the "Development Authority") (collectively, the "Defendants") and allege as follows:

## JURISDICTION, VENUE AND PARTIES

1.       Plaintiff Woda Cooper is an Ohio corporation with its principal place of business in Columbus, Ohio.

2.       Plaintiff Parallel Housing is a Georgia not-for-profit corporation.

3.       Plaintiff Perkins L.P. is a Georgia limited partnership, whose general partners are Perkins Field GP, LLC and Parallel Perkins Field GP, LLC.

4.       Plaintiff Parallel Perkins LLC is a Georgia limited liability company, whose sole member is Parallel Housing, Inc.

5.       Defendant City is a public body corporate and politic created and existing under the laws of the State of Georgia.

6.       Defendant Development Authority is a development authority and public body corporate and politic created and existing under the laws of the State of Georgia and existing as an instrumentality of the City of Warner Robins, Georgia.

7.       This Court has original jurisdiction pursuant to 42 U.S.C. §3613 and 28 U.S.C. §1331.

8.       Venue is proper in this District pursuant to Title 28, United States Code, §1391(b), because the Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## INTRODUCTION

9.       Defendant City and Defendant Development Authority invited the Plaintiffs to build a substantial mixed-use development in downtown Warner Robins, using land owned by the City and presently used as a baseball field near City Hall.  Pursuant to the guidelines laid out in the City's downtown development plan, this would be a public-private partnership, with the

City's land leased to the Plaintiffs, after the City had transferred title to its own entity, the Development Authority.  The Plaintiffs accepted the City's invitation and began the planning, financing, development, and construction process with the City, which the City repeatedly approved through multiple City Council resolutions and meetings over more than 18 months.

10.     Thus, the Plaintiffs contracted with the City to construct, using low-income housing tax credits ("LIHTCs"), on land located one block from City Hall, in the heart of downtown Warner Robins, the "Perkins Field Project" consisting of: (a) a 90 unit rental community with 22 one bedroom, 44 two bedroom, and 24 three bedroom garden-style apartments; (b) additional commercial and retail space, fronting the streets of downtown Warner Robins; and (c) an improved home for the International City Farmers' Market, which would draw thousands of more people each year to downtown Warner Robins.

11.     City Mayor Randy Toms (the "Mayor") and the City Council approved the transaction with the Plaintiffs, and the  Development Authority, after approval by the Mayor and the City Council, entered into an Agreement to Enter Into a Ground Lease (the "Ground Lease Agreement") with the Plaintiffs.  Later, the Mayor and the City Council approved the transfer of Perkins Field to the Development Authority.

12.     Yet after all of the legislative approvals had been granted, and after the Plaintiffs had fulfilled all of the preconditions to enter into the contemplated ground lease and construct the Perkins Field Project, the City (through the actions and decisions of the Mayor) reneged on its promises to the Plaintiffs.  The refusal of the City and the Development Authority to follow through on the Perkins Field Project is a breach of contract, violates the Defendants' statutory duties under the Fair Housing Act, and was done in bad faith.

## GENERAL ALLEGATIONS

13.     Plaintiff Woda Cooper is a real estate development company, specializing in building affordable, multi-family developments, through the use of, among other things, tax credits, such as the tax credits offered by the State of Georgia under Section 42 of the Internal Revenue Code. Woda Cooper has developed over three hundred and fifty (350) multi-family projects across the United States, and holds a reputation as one of the premier developers of affordable multi-family projects in the country.

14.     Plaintiff Parallel Housing is a not-for-profit company based in Athens, Georgia, whose mission is to develop and provide housing for those Georgians who cannot earn enough through their jobs to obtain decent homes without sacrificing their abilities to pay for groceries, medicine, and schooling for their children.

15.     Plaintiff Perkins L.P. was created specifically for the Perkins Field Project on May 22, 2018, and is the limited partnership which will receive the tax credits for the development and will lease the land on which the Perkins Field Project will be built. As of May 22, 2018, Plaintiff Perkins L.P. was duly organized, validly existing, and in good standing under the laws of the state of Georgia, and continues to be so as of the date of this Complaint. The limited partnership agreement of Plaintiff Perkins L.P. specifically grants it the right, power, legal capacity and authority to enter into ground lease option agreements and ground lease agreements and to engage in all business activities necessary for the design, development, construction and operation of a mixed-use development in Warner Robins.

16.     The City is the owner of a certain parcel of land located in Warner Robins, Houston County, Georgia, known municipally as 105 Mulberry Street, described with particularity on the Exhibit A to the Ground Lease Agreement between the Plaintiffs, and known

generally as Perkins Field ("Perkins Field").  Perkins Field is one block from City Hall and is in the middle of the City's downtown redevelopment area.

17.     The Development Authority was created pursuant to the Development Authorities Law of the State, O.C.G.A. § 36-62-1, et seq., as amended, and activated by a resolution of the Mayor and Council of the City of Warner Robins, Georgia, adopted on June 20, 2016 and confirmed on December 12, 2016. The Development Authority was created for a public purpose, namely, facilitating the redevelopment of the City's downtown and of affirmatively furthering fair housing within the City, pursuant to the mandates of the federal Fair Housing Act and the City's Community Development Block Grant ("CDBG") from the United States Department of Housing and Urban Development ("HUD").  As such, the Development Authority was charged by the City with (a) redeveloping Perkins Field and (b) providing both affordable and fair housing in the targeted downtown area of Warner Robins.

## FACTUAL BACKGROUND

### I.     THE CITY OF WARNER ROBINS NEEDS MORE AFFORDABLE HOUSING

#### A. THE NEED FOR AFFORDABLE HOUSING IN WARNER ROBINS, ESPECIALLY FOR AFRICAN AMERICANS

18.     The City expressly recognized the need, over the past decade or so, to bring more affordable housing to the City.  The City has commissioned, and adopted the findings of, numerous studies and redevelopment plans regarding the City's ongoing affordable housing crisis. As a result, the City sought funds from other governmental and private sources, including applying for (and receiving) over a million dollars from HUD (the "CDBG Funds").

19.     When the City applied for the CDBG Funds, the City recognized its obligations to affirmatively further fair housing and to take steps to assist people of low and moderate incomes.

Further, the City has, for many years, certified to HUD that the City would take actions affirmatively further fair housing.

20.     In fiscal year 2018, according to the City's budget, the City received $827,198 in CDBG Funds from HUD. In fiscal years 2019 and 2020, the City estimated the grant funds to be $450,000 for each fiscal year.   The City's adopted annual budgets show CDBG fund expenditures of $717,905 in fiscal year 2018, $1,086,969 in fiscal year 2019, and $930,117 (estimated) in fiscal year 2020.

21.     The City prepared a "2015-2019 Consolidated Plan," for HUD (the "Consolidated Plan"), in accordance with the application guidelines for the CDBG funds, for "the purpose of guiding its efforts in benefiting the city's low-to-moderate income individuals." Consolidated Plan at 2. In that Consolidated Plan, the City acknowledged that housing "deficiencies… were found to exist" and that the City needed to "increase[e] the availability of affordable permanent housing for low-to-moderate income individuals." *Id*.

22.     In conjunction with the Consolidated Plan, and as required by the City's obligations to affirmatively further fair housing in Warner Robins, the City commissioned an "Analysis of Impediments to Fair Housing Choice" by the Middle Georgia Regional Commission (the "AI Analysis"). The AI Analysis was completed in May 2016. The AI Analysis was "an assessment investigating fair housing practices" within Warner Robins, and "examine[d] any obstructions that may hinder the application of fair housing practices."

23.     In the City's Consolidated Plan and the multiple annual reports submitted by the City to HUD thereafter (the Consolidated Annual Performance and Evaluation Reports, or "CAPERS"), the City has repeatedly certified to HUD that it would take actions to affirmatively further fair housing in connection with the City's receipt of the CDBG Funds.   The City is

committed, under the federal Fair Housing Act generally and by these certifications to HUD specifically, to taking steps to affirmatively further fair housing in the City, including in the downtown area encompassing the Perkins Field Project.

24.     In the Consolidated Plan, the AI Analysis, and the CAPERs, the City acknowledged that African-American (as well as Hispanic) residents of Warner Robins faced additional obstacles in obtaining affordable housing at low to moderate income levels, and that there exist significant issues of racial segregation in Warner Robins.

25.     As noted in the Consolidated Plan, there are wide racial disparities in public housing in Warner Robins. The City's housing authority, the Warner Robins Housing Authority ("WRHA") operates 426 housing units with 897 residents. Consolidated Plan at pg. 31. Although the population of the City is only 34.3% African-American, the residents of WRHA's public housing units are 88% African-American. Consolidated Plan at pgs. 24 and 33.

26.     In the Consolidated Plan, the City acknowledged that nearly one-third—31%—of its households are over-burdened by the cost of housing, and that these burdens are not evenly distributed by the race of the household. Indeed, nearly half, or 46%, of African-American households in Warner Robins suffer from housing problems, while in contrast less than 25% of white households suffer from a housing problem. Consolidated Plan at 25.

27.     The median household income in Warner Robins, according to a recent survey, was just $42,795 while the median monthly rent was $840. According to that same survey, approximately 47% of renters within Warner Robins are overburdened by rent. Since renters make up 45.5% of the total population of Warner Robins, approximately 5,800 households within Warner Robins are overburdened by rent. Warner Robins has, compared to similar cities, a very high percentage of residents who are overburdened by rent.

28.     Warner Robins, for its overall population and its number of rent-overburdened households, has a very low number of rental units that have subsidized or restricted rent. There are only 16 apartment communities in Warner Robins offering affordable housing, with only 1313 units. Of those 1313 units, the subsidies for 551 of these are income based, and the other 762 are rent subsidized.

29.     The housing problems in Warner Robins for African-Americans are not confined to just the lowest income levels. For those households with 50% to 80% of the area median income, less than 4% of the white households have a Severe Housing Problem—while over 15% of African-American households have at least one Severe Housing Problem. A "Severe Housing Problem" was defined in the Consolidated Plan as (i) lacking complete kitchen facilities, (ii) lacking complete plumbing facilities, (iii) having more than 1.5 persons per room, or (iv) a Cost Burden over 50%. Consolidated Plan at 26.

30.     The Consolidated Plan went on to acknowledge the racial disparity in housing problems: "White families make up more than 58 percent of the city's total households but only 45 percent of those with a cost-burden problem. Conversely, African Americans comprise 35 percent of the population but 46 percent of the cost-burdened households. Forty-one percent of African American families and 42 percent of Hispanic families have a cost-burden above 30 percent. Both of these are more than 10 percent higher than the jurisdiction's rates." Consolidated Plan at 29-30.

31.     The AI Analysis quantified this cost burden problem: While the fair market rate for a two bedroom apartment in Warner Robins is $713/month, the mean renter's wage is only $10.36/hour. Thus, "[a]n individual receiving the mean renter's wage would have to work at least 53 hours per week to afford a FMR two-bedroom apartment in Warner Robins… At

minimum wage, an individual would need to work 76 hours per week to afford the [fair market rent] for a two-bedroom apartment." AI Analysis at pgs. 22-23.

32.     Moreover, the African-American population in Warner Robins is more concentrated in the northeastern portion of the City, "just west of Highway 247 across from the Air Force Base." AI Analysis at pg. 9. This area of Warner Robins coincides with the areas of greatest poverty, lowest income distribution, and most substandard housing. *Id.* at pgs. 9-14, Consolidated Plan at pgs. 21-29.

33.     Consequently, the rental housing cost-burden in Warner Robins falls disproportionately upon African-Americans.

### B.  WARNER ROBINS NEEDS AFFORDABLE HOUSING FOR AIR FORCE SERVICEMEMBERS

34.     Warner Robins is home to Robins Air Force Base (the "Robins Base"), which is home to five major commands, three air wings, and over 22,000 service members.  While the total workforce at the Robins Base totals about 23,000 (including civilians and contractors), the Robins Base has only 259 privatized housing units on base, with just 876 residents. As such, a large number of service members must find housing off base.

35.     Of those service members, the following pay grades qualify for affordable housing:

## Airmen Income Levels

WODA COOPER COMPANIES

parallel housing
AFFORDABLE. SUSTAINABLE.

| Airmen Income Levels - Warner Robins Air Force Base | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Monthly Salary | Annual Income | Income Limits 50% AMI | | | Income Limits 60% AMI | | |
| | | | 1 person | 2 person | 4 person | 1 person | 2 person | 4 person |
| E-1 Airman Basic | 1,681 | 20,172 | 23,450 | 26,800 | 33,500 | 28,140 | 32,160 | 40,200 |
| E-2 Airman | 1,884 | 22,608 | 23,450 | 26,800 | 33,500 | 28,140 | 32,160 | 40,200 |
| E-3 Airman First Class | 1,981 | 23,772 | 23,450 | 26,800 | 33,500 | 28,140 | 32,160 | 40,200 |
| E-4 Airmn Senior | 2,195 | 26,340 | 23,450 | 26,800 | 33,500 | 28,140 | 32,160 | 40,200 |
| E-5 Staff Sgt | 2,393 | 28,716 | 23,450 | 26,800 | 33,500 | 28,140 | 32,160 | 40,200 |
| E-6 Technical Sgt | 2,613 | 31,356 | 23,450 | 26,800 | 33,500 | 28,140 | 32,160 | 40,200 |
| E-7 Master Sgt | 3,021 | 36,252 | 23,450 | 26,800 | 33,500 | 28,140 | 32,160 | 40,200 |
| D-1 2nd Lt | 3,188 | 38,256 | 23,450 | 26,800 | 33,500 | 28,140 | 32,160 | 40,200 |

- **All Enlisted Airmen married with 2 children have Income Levels below the Income Limit to live at Perkins Field**

36.    In sum, over one-third of the service members at Robins Base would be income eligible for the Perkins Field proposed development.

### C. THE CITY IS WILLING TO PLACE AFFORDABLE HOUSING OUTSIDE OF DOWNTOWN, IN SEGREGATED AREAS OF CONCENTRATED POVERTY

37.    In the Consolidated Plan, the City identified a "Neighborhood Strategy Area," which "contains the city's highest concentrations of low-to-moderate income persons" for specific targeting (the "NSA"). Consolidated Plan at 102.  Since the adoption of the Consolidated Plan, the City has focused its efforts on bringing affordable housing to the NSA.

38.    Prior to the Perkins Field Project, the City had already applied for more affordable housing with Pennrose Properties, LLC ("Pennrose"), another affordable housing developer. Specifically, the City partnered with Pennrose to construct a multi-family, affordable housing development on U.S. Highway 129 (the "Pennrose Project").

39.    Like the Perkins Field Project, the Pennrose Project would have approximately ninety (90) housing units and would be financed using LIHTCs. But unlike the Perkins Field

Project, the Pennrose Project was far away from downtown Warner Robins and very close to a racially segregated, City-owned public housing project.

40.     Affordable housing projects routinely rely on the economic advantages provided by LIHTCs, for almost all projects (like the Pennrose Project and the Perkins Field Project) would not be economically viable, and thus unable to provide affordable housing where shortages exist, without the use of LIHTCs. But LIHTCs require the involvement of the local government, and a close cooperation between the local government and the affordable housing developer. And the failure of a developer to complete a LIHTC project after having been awarded LIHTCs can have significant negative impacts on the developer's future ability to obtain LIHTCs for other developments.

41.     The Pennrose Project relied upon what are known as "9% LIHTCs." When Pennrose applied for these 9% LIHTCs, the City was necessarily deeply involved in the application process. During that process, upon information and  belief, the Mayor, Council and City Attorney would have (or should have) become aware of the intricacies of the LIHTC application process and the consequences to the developer if a project, after an award of LIHTCs, fails to complete.

42.     The Pennrose Project moved swiftly through the City planning and permitting phase without the delays and obstacles encountered by the Plaintiffs in developing the Perkins Field Project. The City and the Development Authority are continuing to work with Pennrose to build additional affordable housing in that same area.

43.     The City and the Development Authority are willing to cooperate with affordable, multi-family housing, built using low income housing tax credits, if that housing is located in a segregated area, near existing public housing, and far away from Downtown Warner Robins.

## II. THE CITY AND THE DEVELOPMENT AUTHORITY RECOGNIZE NEED TO REVITALIZE DOWNTOWN THROUGH AFFORDABLE HOUSING AND MIXED USE DEVELOPMENTS

### A. WARNER ROBINS ADOPTED A PLAN TO REVITALIZE DOWNTOWN, WHICH INCLUDED PERKINS FIELD AND MULTI-FAMILY AFFORDABLE HOUSING NEXT TO CITY HALL

44.     The City has long recognized the need to redevelop its downtown area. This began as far back as 2007, when the City developed the 2007 Redevelopment Plan. In 2009, the City also developed a "Downtown Redevelopment Plan."

45.     Both of these were updated by the creation of the 2012 City of Warner Robins Redevelopment Plan (the "2012 Redevelopment Plan"), created by the City in conjunction with the Warner Robins Redevelopment Authority. A true and correct copy of the 2012 Redevelopment Plan is attached hereto as **Exhibit A**.

46.     The 2012 Redevelopment Plan anticipated (a) the creation of Tax Allocation Districts (like the kind anticipated for the Perkins Field Project), (b) the simplification of the assembly of large enough tracts of land to attract private developers like the Plaintiffs, and (c) the issuance of tax exempt bonds for redevelopment purposes (like the kind being used by the Plaintiffs here).

47.     The 2012 Redevelopment Plan identified a Commercial Corridor Redevelopment Area (the "Redevelopment Area"), which specifically included Perkins Field and the Warner Robins City Hall. The 2012 Redevelopment Plan focused on the need for housing redevelopment, because the Redevelopment Area had "large areas of substandard housing" and that "*492* homes were either substandard or dilapidated." 2012 Redevelopment Plan at pg. 11 (emphasis in the original).

12

48.     The 2012 Redevelopment Plan found that, within the Redevelopment Area, between 2000 and 2010 the number of housing units had dropped by 268 units, and that of the housing which was available, "an overwhelming majority was renter-occupied" in contrast to the rest of Warner Robins, which had a significant majority of owner-occupied residences. Moreover, the existing housing stock was "deteriorated or poorly maintained." Pg 7. The 2012 Redevelopment Plan identified through this analysis a significant need for quality, affordable housing for renters in the downtown Warner Robins area, including Perkins Field.

49.     Further, in connection with the 2012 Redevelopment Plan and the Downtown Redevelopment Plan, the City applied for, and obtained, the CDBG Funds, which were received directly by the City and have been administered through the City's Community Development Department. The CDBG Funds have been spent in the NSA, and in particular around the Perkins Field Project site.

50.     The 2012 Redevelopment Plan went on to note that the area would "not support new business ventures unless changes are made within the area," and that "current conditions can hardly sustain the existing business activity." 2012 Redevelopment Plan at pg 7.

51.     With an eye toward correcting these long-standing problems, the 2012 Redevelopment Plan designated the Perkins Field area as a "Proposed Area for Housing Redevelopment," with multi-family rental units, and that the City "might…partner with a developer to establish a low-income tax credit apartment complex in order to provide a suitable living alternative to many of the houses which are substandard yet inhabited." 2012 Redevelopment Plan at pg 12.

52.     Indeed, in the 2012 Redevelopment Plan, the City explicitly "plan[ned] to leverage private resources for the projects outlined on the previous pages" of the 2012

Redevelopment Plan. The very first initiative listed was the use of LIHTCs by the City to "address[] the need for low-income housing by forming a public-private partnership with a developer interested in constructing an apartment community with low-income housing tax credits. The developer would, in turn, reserve all or a portion of the units for low-income tenants." 2012 Redevelopment Plan at pg. 14.

53.     The 2012 Redevelopment Plan described the 2010 demographics of the area affected by the Redevelopment Plan in 2010 as being 54.20% African-American and 34.90% white, compared to the whole of Warner Robins, which was 38% African-American and 52% white, according to the 2010 census.

54.     Houston County, which is home to Warner Robins, supported the 2012 Redevelopment Plan in the Houston County Joint Comprehensive Plan Update, prepared in 2017 (the "Houston County Plan"). The Houston County Plan committee encouraged Warner Robins "to embrace the concept of mixed use zoning and developments throughout their potential downtown area," just like the mixed use Project the Plaintiffs intend to build on Perkins Field in Warner Robins. Houston County Plan at pg. 34.

55.     The Houston County Plan directed Warner Robins to pursue "residential development with a healthy mix of uses within easy walking distance" of new affordable housing stock. Houston County Plan at pg. 25. The Perkins Field Site complied with this mandate, as it is in the Redevelopment Area, is within easy walking distance of restaurants, stores, the International City Farmers Market, City Hall and other employers.

**B.  THE 2017 COMMUNITY TRANSFORMATION PLAN**

56.     The City and the Development Authority contracted Mosaic Community Planning ("Mosaic") to prepare a "Community Transformation Plan" in 2017. The City and the

14

Development Authority worked in close cooperation with Mosaic to produce this plan for the redevelopment of the NSA.

57.     According to the Community Transformation Plan, the "Defined Neighborhood" including Perkins Field was both more segregated than Warner Robins and Houston County  and in need of significant assistance from the City and the Development Authority:

      a.  Large disparities exist in household income as well, with neighborhood households receiving 25% less than the average household in Warner Robins and 56% less than Houston County households;

      b.  Roughly 1,115 of the neighborhood's 2,176 households (51%) are estimated to be low-income, with incomes at or below 60% of the Warner Robins metropolitan area's median income;

      c.  Rents in the neighborhood are higher than those in the City, county, and region. At a median rent of $901, a renter household at the median income for the neighborhood ($34,215) would be cost burdened, spending more than 30% of its income on housing expenses; and

      d.  In the Defined Neighborhood, 48% of the population is African-American and 36% is white. Houston County and the region as a whole have significantly larger white populations than the subject neighborhood.

Community Transformation Plan at pgs 9-10.

58.     The Community Transformation Plan was prepared by the City specifically to assist the City and Pennrose with the LIHTC application process for the Pennrose Project.

### III.     WARNER ROBINS INVITES WODA COOPER AND PARALLEL HOUSING TO DEVELOP AFFORDABLE HOUSING IN DOWNTOWN WARNER ROBINS

## A. THE CITY AND THE DEVELOPMENT AUTHORITY RECRUIT WODA COOPER AND PARALLEL HOUSING TO DEVELOP PERKINS FIELD

59.     In 2017, the City was recruiting experienced private developers who, like Woda Cooper and Parallel Housing, had the ability to leverage tax credits to build high quality, affordable housing within a larger mixed use development. This recruiting effort was part and parcel not only of the Redevelopment Plan, but also as part of the City's statutory obligations to affirmatively further fair housing.

60.     Thus, in late 2017, the City attended a development conference in Atlanta, Georgia, intending to market the City as an attractive location for a mixed use development with a strong affordable housing component. There representatives of Woda Cooper met with Gary Lee, the City's Director for Economic Development. Mr. Lee attended that development conference precisely for the purpose of bringing developers like the Plaintiffs to Warner Robins. At that conference, Mr. Lee invited Woda Cooper to visit Warner Robins to encourage Woda Cooper to invest in Warner Robins and to bring much needed affordable housing development to the City.

61.     After this conference meeting, the Plaintiffs' representatives met on January 16, 2018 with Mr. Lee and Mr. Charles Whatley, a consultant for the City and the Development Authority, about bringing development to downtown Warner Robins. In that meeting, Mr. Lee and Mr. Whatley continued to encourage the Plaintiffs to invest in affordable housing in downtown Warner Robins.

62.     The City and the Development Authority initially encouraged the Plaintiffs to develop affordable housing within a mixed use development on land owned by the Catholic Diocese of Savannah, and used by Sacred Heart Church, in downtown Warner Robins and in the Redevelopment Area (the "Sacred Heart Site"). The Sacred Heart Site was only three blocks

16

from the Warner Robins City Hall. However, negotiations for that site foundered, as the Diocese and the Plaintiffs were unable to reach an agreement for the sale of the Sacred Heart Site.

63.     But the City and the Development Authority were not deterred by the lack of agreement on the Sacred Heart Site, because the need for both affordable housing and downtown redevelopment in Warner Robins was (and continues to be) so great. Instead, the City and the Development Authority took matters in their own hands, and proposed that Woda Cooper and Parallel Housing instead use land already owned by the City, known as Perkins Field, which was just across the street from the Sacred Heart Site.

64.     Perkins Field is an old baseball field, with a boarded up concession stand. It is no longer being used by the City for baseball activities, as those have moved to other baseball facilities owned by the City, and ultimately to the City's new multimillion dollar North Houston Sportsplex. The City and the Development Authority could offer the Plaintiffs rights to Perkins Field, since it was no longer being used by the City for a governmental purpose, and was surplus to the City's needs for its governmental purposes.

65.     The Perkins Field site was ideal for the sort of mixed use development identified by the City and the Development Authority in their various downtown and area redevelopment plans. The Perkins Field site is within the City's NSA, is within the Redevelopment Area, is within steps of the City Hall, is located on the Warner Robins Transit line, and is comprised of land which the City has abandoned for any ongoing governmental purpose.

66.     Thus, with the City and the Development Authority now focusing on affordable housing development on Perkins Field, on April 16, 2018 the Plaintiffs attended a City Council meeting, where the Plaintiffs were introduced to the Mayor and every City Council Member. During that session, the Mayor and each City Council Member expressed their support of the

17

Plaintiffs developing affordable housing within a mixed use development on the Perkins Field site.

67.    Buoyed by the unanimous support from the Mayor and City Council, the Plaintiffs worked on a concept plan for Perkins Field (the "Concept Plan"). This Concept Plan called for a long-term ground lease on Perkins Field from the City or the Development Authority to the Plaintiffs and the construction on that land of a mixed use development, providing ninety housing units (eighty-one units of which would be affordable for households earning less than 60% of the area's median income), significant retail and commercial space, an improved pavilion for the International City Farmer's Market, and other beneficial components.

68.    Under the Concept Plan, the permanent financing for the Perkins Field Project would be supplied in part by a Taxable Industrial Revenue Bond issuance by the Development Authority (the "Bonds"), in part through the use of LIHTCs, and in part by an equity investment by the Plaintiffs.

69.    On May 2-4, 2018 the Plaintiffs discussed the Concept Plan with the Development Authority and its advisor, Mr. Whatley, both of whom responded favorably to the structure of the plan and agreed to move forward with the Concept Plan.

70.    On May 7, 2018, the Mayor and City Council, in a closed session, discussed the Concept Plan. The Mayor and City Council spoke approvingly of the Concept Plan, and authorized the Plaintiffs to proceed with the development and to submit an application for LIHTCs to the Georgia Department of Community Affairs ("DCA"), the state agency charged with administering the LIHTC process.

71.    On May 16, 2018, the City confirmed, in a zoning letter issued by the City's Director of Community Development (the "Zoning Letter") that the Perkins Field site was

properly zoned to allow the development of ninety (90) housing units, including the eighty (80) affordable units and ten (10) market rate units envisioned by the Concept Plan. The Zoning Letter conformed to the Concept Plan, and confirmed to the City, the Development Authority and the Plaintiffs that there would be no regulatory obstacles to the Perkins Field Project. A true and correct copy of the Zoning Letter is attached here to as **Exhibit B**.

### B. AFTER THE CITY COMMITS TO THE PERKINS FIELD PROJECT, THE PLAINTIFFS INVEST HUNDREDS OF THOUSANDS OF DOLLARS TO MAKE IT A REALITY

#### 1. The Defendants' Commitment to a Ground Lease Agreement

72. On May 22, 2018, the Development Authority and Perkins L.P. entered into the Ground Lease Agreement. This agreement obligated the Development Authority to lease the Perkins Field site to Perkins L.P. upon the satisfaction of the limited conditions set forth in that agreement. A true and correct copy of the Ground Lease Agreement is attached hereto as **Exhibit C**.

73. The Ground Lease Agreement imposed four conditions precedent upon the Plaintiffs before the Development Authority was "obligated to complete the transaction and to consummate the groundlease of the Property":

    a. The representations and warranties of the Plaintiffs in the Ground Lease Agreement were true and correct;

    b. The Plaintiffs would obtain all governmental approvals, licenses, permits and other approvals necessary for the consummation of the groundlease;

    c. The Plaintiffs would receive an allocation of LIHTCs from DCA; and

    d. All other conditions of the Ground Lease Agreement in favor of the Development Authority would be satisfied.

74.     In full reliance on the contractual commitments made by the Development Authority in the Ground Lease Agreement, the Plaintiffs incurred the expenses necessary to fulfill their own contractual requirements, spending over $310,000 on architects and design services; over $85,000 on engineering services; over $37,000 on environmental and geotechnical testing;  over $76,000 to the Georgia Housing and Finance Authority for financing fees; and ultimately, $139,598 to the City and the Development Authority for their legal fees. In total, the Plaintiffs have spent or incurred obligations of over $1,160,000 in costs and expenses.

75.     On May 22 and May 23, 2018, the City and the Development Authority also provided the Plaintiffs with various other materials to support the financing component of the Perkins Field Project and its related tax credit application. This included an owner environmental questionnaire related to the Perkins Field site, prepared at the direction of and signed by the Mayor (the "Environmental Questionnaire"). A true and correct copy of the Environmental Questionnaire is attached hereto as **Exhibit D**.

76.     The Mayor signed the Environmental Questionnaire on May 23, 2018, because he knew that the completed questionnaire was necessary (along with the Ground Lease Agreement), for the Plaintiffs to include in the Perkins Field Project LIHTC application package sent to DCA. When the Mayor provided the Environmental Questionnaire to the DCA, he was certifying that the City and the Development Authority had determined (and committed to) the type and nature of the transaction between the City and the Development Authority on the one hand and the Plaintiffs on the other: it was, and is, a "Ground Lease to private ownership entity."

77.     Upon information and belief, the Mayor's signature on the Environmental Questionnaire for submission to the DCA was done after review and sign off by the City Attorney.

78.     After this approval, the Plaintiffs' environmental and geotechnical consultant, United Consulting, entered onto Perkins Field (with the approval of the City and the Development Authority) to conduct physical and environmental testing, including soil borings. In March 2019, United Consulting drilled twenty-one (21) soil test borings and made an in-depth analysis of the Perkins Field Site's subsurface conditions. That analysis discovered what site preparation would need to be done for any commercial or residential development, including determining the nature and extent of the filling and grading required for any foundations.

79.     The City had not previously done this type of physical testing on the Perkins Field Site, and the Plaintiffs' efforts and expenses in generating the geotechnical and environmental information about Perkins Field was and is of significant value to the City and the Development Authority, as it proved the suitability of Perkins Field for a mixed-use development like the Perkins Field Project, and these test results could be used in connection with any future development of Perkins Field.

80.     With these agreements and commitments (including the Ground Lease Agreement and the Environmental Questionnaire), the City and the Development Authority granted "site control" of Perkins Field to the Plaintiffs, for the purposes of pursuing LIHTCs for the Perkins Field Project with DCA. No application for LIHTCs can be made to DCA unless and until the owners of the property (here, the Defendants) have agreed to the transfer of the real property at issue, either by deed or through long term lease.

### 2. With the City on Board, the Plaintiffs Secure Funding and the LIHTC Award from DCA

81.     On May 23, 2018, the day after the Mayor and City Council approved the Concept Plan, the Plaintiffs secured a commitment from the Bank of America Merrill Lynch to provide a $11,630,000 construction loan, and a $2,125,000 permanent loan. In connection with

this commitment for the construction loan, Bank of America Merrill Lynch also committed to provide an equity investment of $12,634,736.00. Although alternative funding for the Perkins Field Project was later obtained from SunTrust Bank (now Truist) along similar terms, these early funding commitments demonstrated the strong financial viability of the Perkins Field Project.

82.    On May 24, 2018, the Plaintiffs submitted the Perkins Field Project LIHTC application to DCA. This application, which was predicated upon the contractual commitments of the City and the Development Authority, spanned hundreds of pages and included detailed information on financing, planning, construction, and community benefits. The Plaintiffs incurred substantial expenses in the preparation of this application, none of which would have been incurred without the contractual commitments from the City and the Development Authority.

83.    On November 19, 2018, DCA officially notified the Plaintiffs that the Perkins Field Project had qualified for federal/state tax credit award in the amount of $936,000 annually (the "Tax Credit Award"). A true and correct copy of the Tax Credit Award is attached hereto as **Exhibit E**. The Plaintiffs provided a copy of the Tax Credit Award to the Development Authority. This award would provide the Perkins Field Project with that amount of affordable housing tax credits over a 10-year period. This Tax Credit Award fulfilled the third of the Plaintiffs' four conditions precedent to the consummation of the ground lease for the Perkins Field Project, pursuant to the Ground Lease Agreement.

84.    The DCA receives dozens of applications for LIHTC awards every year. Because the number of requests exceeds the number of LIHTC awards that DCA can sponsor, the DCA has developed a scoring system to rank the proposals. The DCA scored the Perkins Field Project

22

as the fourth highest project, in large part because of (a) its location in an urban redevelopment area in downtown Warner Robins, (b) the long term lease being offered by the City and the Development Authority, and (c) the need for affordable housing in the downtown Warner Robins market.

85.     With the Tax Credit Award, the Plaintiffs and the Defendants became obligated to DCA to complete the Perkins Field Project, or face significant adverse future consequences. For the Plaintiffs, the consequences for failing to complete the Perkins Field Project would not only create a situation where they were unable to recoup the hundreds of thousands of dollars of third party costs and thousands of manpower hours, but would  also significantly impair their reputation in the State of Georgia as a result of their failure to utilize the awarded credits.

## C. WITH THE CITY'S PERMISSION AND ENCOURAGEMENT, THE PLAINTIFFS BEGIN DETAILED PLANNING AND COMMENCEMENT OF THE PERKINS FIELD PROJECT

86.     After the Tax Credit Award, the City organized a pre-construction meeting on December 17, 2018 with the Plaintiffs. This meeting was attended by the Mayor, by the City's Community Development Department, by the City's Building Director and by the City's Engineer. The Plaintiffs attended with their design and construction team, which included their architect, civil engineer, landscape architect and general contractor. The purpose of this meeting was to ensure that all parties understood what actions needed to be taken to insure the completion of the Perkins Field Project, and what governmental approvals, licenses and permits were needed for the Perkins Field Project.

87.     In the pre-construction meeting, the Plaintiffs detailed for the City officials how the construction process would proceed and recommitted to completing the Perkins Field Project, while the City officials provided the Plaintiffs with the details on the necessary approvals,

licenses and permits. The Plaintiffs were able then, and are able now, to meet all of the requirements and conditions for the issuance of the necessary approvals, licenses and permits for the Perkins Field Project. And based upon the information provided by the City officials, the Plaintiffs continued to work on their building plans for the Perkins Field Project.

88.     The Plaintiffs and the Defendants agreed that the Perkins Field Project, as a mixed-use development, would provide a much needed new venue for the City's farmers market, known as the "International City Farmers Market" (the "Farmers Market"). The City had long desired an improved venue for the Farmers Market, as this had been included in the City's 2012 Redevelopment Plan and Downtown Development Plan. Additionally, an improved venue for the Farmers Marker would expand economic opportunities, including food shopping and jobs, within easy walking distance of the people of the Perkins Field neighborhood and especially the Perkins Field Project. Thus, on January 17, 2019, the Plaintiffs met with Gary Lee, Charles Whatley and Jodi Dailey for the Farmer's Market Design Meeting, to discuss and approve the Plaintiffs' plan for a new Farmer's Market covered pavilion as part of the Perkins Field Project.

89.     By February 2019, the building plans for the Perkins Field Project had been completed by the Plaintiffs' architects and engineers, and were then submitted to the City for review and approval. These building plans were in complete compliance with applicable building and zoning codes at the time of submission, and required only a ministerial review by the City before the necessary approvals, permits and licenses could be issued.

90.     In full reliance on the promises and obligations of the Development Authority in the Ground Lease Agreement, the Plaintiffs continued their work with other agencies and authorities of City and the Development Authority. The attorneys for the City and the Development Authority began drafting, with the Plaintiffs, a comprehensive "Development

Agreement" for the Perkins Field Project in mid-February 2019. That Development Agreement specified the material terms of the contracts between and among the City, the Development Authority, and the Plaintiffs, including the terms of the leasehold interest to be given to the Plaintiffs for Perkins Field. The City and the Development Authority, as part and parcel of the terms of the Development Agreement, required the Plaintiffs to reimburse their legal expense obligations.

91.     On April 18, 2019, the Mayor and City Council hosted the Plaintiffs at a special City Council meeting, called specifically to discuss the Perkins Field Project. According to the City, there had been concerns raised by certain members of the Warner Robins community about "the type" of residents who would live in the Perkins Field Project. The Mayor and members of City Council communicated to the Plaintiffs that a portion of Warner Robins did not want "Section 8 housing," "public housing" or a "criminal element" in downtown Warner Robins, and that they were concerned that a mixed use development with a strong affordable housing component would attract the wrong type of people to downtown Warner Robins.

92.     At the April 18, 2019 special meeting, the Plaintiffs went into great detail with the Mayor, the City Council and the City Attorney about exactly who the Perkins Field Project would serve. Because of the restrictions associated with the LIHTC award, the overwhelming majority of tenants at the Perkins Field Project would have to have an income no greater than either 50% or 60% of the area's median income ("AMI"). Thus, these tenants would have an income no greater than $23,450/year (for a single person at 50% of AMI) to $46,680/year (for a family of six at 60% of AMI).

93.     The Plaintiffs  explained to the Mayor, the City Council, and the City Attorney that the project's potential tenants would most likely be drawn from servicemembers at Robins

Base, City workers, and others working at the schools, hospital and retail stores in the downtown Warner Robins area. The Plaintiffs noted that because of the level of wages and salaries being paid by the City, a large number of City employees would qualify to rent the affordable housing units at the Perkins Field Project, including utility maintenance workers, building maintenance workers, and custodians. The Plaintiffs also presented that, for workers in the private sector, based upon U.S. Department of Labor statistics for Warner Robins, potential tenants would include Warner Robins residents working in food service, personal care, building maintenance, and healthcare support occupations.

94.     Upon information and belief, in Warner Robins, and in particular in the NSA and the Perkins Field Project neighborhood, most of the City and private sector workers in the foregoing categories are either African-American or Hispanic.

95.     A true and correct copy of the Powerpoint presentation made by the Plaintiffs to the Mayor, the City Council, and the City Attorney at the April 18, 2019 special meeting is attached hereto as **Exhibit F**.

96.     After the April 18, 2019 special City Council meeting and in reliance on the City's commitment, the Plaintiffs continued to work diligently on the Perkins Field Project. The Plaintiffs continued to spend hundreds of thousands of dollars developing and obtaining approvals for the drawings and plans of the Perkins Field Project. The Plaintiffs incurred contractual commitments for use of the retail and commercial space, including entering into a separate agreement to master lease the four thousand square feet of retail and commercial space.

97.     On June 11, 2019, the Plaintiffs' building plans for the "Perkins Field Apartments" were approved by the City's Engineer for Plan Review, and the City so notified the Plaintiffs. The City's letter was blunt and straightforward: "The plans are approved." The

building plans approved by the City included not just the apartments, but also the additional retail and commercial space and all of the other buildings associated with the Perkins Field Project. After the receipt of this letter, the Plaintiffs had fulfilled their obligation to obtain approval of its building plans for the Perkins Field Project.

98.     Later, the City informed the Plaintiffs that the Perkins Field Project building permits were ready to be picked up. On July 18, 2019, the Building and Transportation Director for the City wrote the Plaintiffs that "The building plans regarding the Perkins Field are approved" subject only to a few ministerial actions, such as payment of water and sewer tap-on fees, use of Code-compliant equipment and construction, installation of 4 inch street numbers on the building, and the like. A true and correct copy of this letter is attached hereto as **Exhibit G**.

99.     Thus, between May 2018 and January 2020, the Plaintiffs engaged and paid environmental and geotechnical experts, market analysts, engineers and architects. These third parties completed environmental studies, geotech reports, market studies, and civil plans and architectural drawings for the Perkins Field Project, which the Plaintiffs submitted to the City. The Plaintiffs have expended over $1.1 million to date for planning, permitting, and other development costs and expenses.

### D. CITY AND DEVELOPMENT AUTHORITY REAFFIRM THE PERKINS FIELD PROJECT TERMS

100.     By August 1, 2019, the Plaintiffs had fulfilled each of the conditions precedent in the Ground Lease Agreement, such that the Plaintiffs were entitled to lease Perkins Field from the Development Authority. Both the Development Agreement and the Ground Lease were in all material respects completely negotiated. At this point, the parties had reached agreement on all material terms with regard to the Perkins Field Project.

101.    On August 5, 2019, the Mayor and City Council adopted a resolution approving the Development Agreement with the Plaintiffs (the "Commitment Resolution"), and directing the Mayor to sign the lease of Perkins Field to the Plaintiffs "pending the grant being lifted." Thus, after the meeting of the Mayor and City Council on August 5, 2019, the City had one performance obligation left: "the lifting of the grant."

102.    The "grant" in the Commitment Resolution refers to the restrictions imposed by the City's receipt of a small financial grant from the Georgia Department of Natural Resources ("DNR") more than fifty years ago, which was (upon information and belief) used for the construction or maintenance of the baseball field at Perkins Field (the "DNR Grant").

103.    Upon information and belief, the City has been working for years to transfer the DNR Grant to the City's new, multi-million dollar North Houston Sports Complex on Houston Road. The transfer of the DNR Grant to the North Houston Sports Complex required only certain administrative, ministerial acts by the Mayor or at the direction of the Mayor —i.e., in submitting a checklist, materials or responses to a questionnaire (collectively, the "DNR Questionnaire") to the DNR. The City had known about the DNR Grant well in advance of the City's invitation to the Plaintiffs to develop Perkins Field.  The City has in its possession, or could through ministerial actions easily and quickly obtain, all of the required materials and information for the transfer of the DNR Grant from Perkins Field to the North Houston Sports Complex, such that, at the direction of the Mayor, the City could promptly and at little cost accomplish the "lifting of the grant" from Perkins Field.

104.    By December 5, 2019, the resolution of the approval of the Bonds (the "Bond Resolution") by the Development Authority was complete, with all of its exhibits, including the Development Agreement, a deed to secure debt for the Bonds, and the Ground Lease. However,

the City and the Development Authority refused to consider approval of the Bond Resolution unless and until the Plaintiffs had paid the outside attorneys for the City and the Development Authority $139,238 before the meeting of the Board of the Development Authority on the evening of December 5, 2019.

105.    The demand for this payment was not subtle: the City and the Development Authority required that the Plaintiffs wire these funds before 4pm on December 5, such that receipt of the wire could be confirmed prior to the Development Authority Board meeting. Believing that the City and the Development Authority were still operating in good faith and with the intent to fulfill their contractual and statutory obligations, the Plaintiffs acceded to the payment demand by the City and the Development Authority and hastily arranged a wire of $139,238.

106.    After the Plaintiffs had completed the $139,238 wire for the attorneys for the City and the Development Authority, the Development Authority approved the Bond Resolution (with all exhibits), and authorized its attorneys to file a Petition and Complaint, pursuant to the Revenue Bond Law of Georgia, for an order validating the issuance of the Bonds (the "Petition and Complaint"). A true and correct copy of the Resolution of the Development Authority, approving the Bond Resolution, is attached hereto as **Exhibit H**.

107.    On December 9, 2019, the Petition and Complaint was filed in the Superior Court of Houston County, Georgia.

## IV.    THE CITY SUDDENLY RENEGES ON ITS PROMISES TO THE PLAINTIFFS

### A. THE CITY AND THE MAYOR CALL A HALT TO ALL PROGRESS ON THE PERKINS FIELD PROJECT

108.     Upon information and belief, in the fall of 2019, the Mayor began using the powers of his office to obstruct the completion of the Perkins Field Project, originating out of the opposition of the Mayor and others within Warner Robins to low income and affordable housing in Downtown Warner Robins. The Mayor and the City relied upon deception and delay to obstruct the progress of the Plaintiffs on the Perkins Field Project.

109.     Upon information and belief, the opposition within Warner Robins to the Perkins Field Project has been driven in part by racial animus. In the fall of 2019, representatives of Woda Cooper were told, repeatedly, by a lobbyist for the City that the significant opposition in Warner Robins to the Perkins Field Project was driven by people who "did not want low income at this location." Other opposition, including political campaigns, was conducted using code words like combining "opposition to government housing" with opposing "rising crime rates."

110.     The day after the Mayor and City Council adopted the Commitment Resolution, on August 6, 2019, the Plaintiffs went to City Hall to pay water & tap fees and to pick up the building permit for the Perkins Field Project. However, the City, through the Mayor, had instructed its employees not to accept payment from, or to release utility taps or to release building permits to, the Plaintiffs.  A true and correct copy of the email containing these instructions is attached hereto as **Exhibit I**.  The Plaintiffs were informed by the Warner Robins Building and Transportation Director via email on August 6, 2019, that notwithstanding the approval of the building plans, the Perkins Field building permits would not be issued until the ground lease was signed by the Mayor, and that the ground lease would not be signed until the DNR Grant was released.

111.     Unbeknownst to the Plaintiffs, the Mayor had decided at this point that he would refuse to fulfill the obligations of his office, or to accomplish the tasks approved by the City

Council in the Commitment Resolution, because the Mayor had decided to renege on the contractual and statutory commitments of the City and the Development Authority to the Plaintiffs. The Mayor decided that, through his own misfeasance, he would frustrate the democratic decision of the City Council to proceed with the Perkins Field Project.

112.   Throughout the fall of 2019 and into the winter of 2019-2020, the Mayor deceived the Plaintiffs as to the status of the City's efforts to have the DNR Grant released. On December 9, 2019, the Plaintiffs met with Monique McBride, a representative of the DNR with responsibility over the DNR Grant. The DNR told the Plaintiffs that the City still needed to provide certain data to complete the conversion (in order to release the DNR grant form Perkins Field) and that this process had been going on for years. At this meeting the Plaintiffs and DNR identified items to be accomplished and to be discussed with both the Mayor and the City Attorney. To that end, the Plaintiffs prepared an outline of the remaining information needed by DNR.

113.   With that outline, the Plaintiffs met on December 11, 2019 with the City Attorney to discuss the status of the release of the DNR Grant and the City's efforts to comply with its contractual obligations. The Plaintiffs brought with them the list of information needed to complete the DNR Questionnaire. Although the DNR Grant Release Questionnaire should have been, and easily could have been completed in (or well before) the Spring or Summer of 2019, the City Attorney informed the Plaintiffs at this meeting that the City would not be working on this matter, and that the Mayor had not authorized any work on this matter.

114.   The Plaintiffs expressed their continued willingness and ability to complete the Perkins Field Project in a January 8, 2020 meeting with the City. Representatives of the Plaintiffs met on that date in the Mayor's conference room with the Mayor and City Attorney while the

City's development consultant attended by the phone. The City Attorney again stated that he had not been authorized to provide the DNR with the needed items to complete the release of the DNR Grant. Right there and then, the Mayor asked for the DNR Grant release outline prepared by the Plaintiffs, and the Plaintiffs provided it to the Mayor. The Mayor then told the Plaintiffs that the Mayor would then authorize the City Attorney to complete gathering the missing documents and send them to the DNR.

115.     But the Mayor's orders to the City Attorney to complete the DNR Grant Release Questionnaire were illusory, for once the Plaintiffs left the meeting, the Mayor instructed the City Attorney to stop work on the DNR Grant release list.

## B. THE MAYOR PROPOSES BAIT AND SWITCH "SOLUTIONS" WHICH ARE UNFEASIBLE, AND WHICH WOULD NOT FURTHER FAIR HOUSING

116.     The hostility of the Mayor to the Perkins Field Project in downtown Warner Robins was not limited to the Mayor's failure to perform the ministerial tasks required of him by the City's contract with the Plaintiffs. Instead, the Mayor attempted to divert the Plaintiffs to another site in Warner Robins, well away from the downtown Redevelopment area.

117.     In the same January 8, 2020 meeting when the Mayor made his false promises about the DNR Grant release, the Mayor suggested that the Plaintiffs consider building on two contiguous parcels of land, on Green Street. This land was located further north from City Hall and just a couple of blocks away from a public housing project operated by the Warner Robins Housing Authority. This "alternative site" proffered by the Mayor, known municipally as 99 and 101 Green Street, is bordered on the south by a large pond, on the north by a large self-storage facility across Green Street, on the east by another self-storage facility, and on the west by an auto-parts store (the "Green Street Site").

118.     Despite the incredible amount of additional costs that would be incurred and the loss of most of the over $1,100,000 then expended on the Perkins Field Project, the Plaintiffs agreed to look at the Green Street Site proposed by the Mayor. The Mayor agreed that if this site was not acceptable, the Plaintiffs would go back to the Perkins Field site that had been promised by the City in the first place. Believing wrongly that the Mayor was operating in good faith, the Plaintiffs left the meeting to review the Green Street Site.

119.     On January 14, 2020, the Mayor sent the Plaintiffs information on the Green Street Site, to entice the Plaintiffs to release their rights to develop the Perkins Filed Project.  But based upon the limited information provided by the Mayor, the Green Street Site was never a viable alternative for development and was far inferior to Perkins Field, for the purposes of the City, the Development Authority, the Plaintiffs, and future tenants. Unlike Perkins Field, the Green Street Site (a) is outside of the Redevelopment Area; (b) is isolated from economic activities and opportunities which are within walking distance of Perkins Field; (c) does not have the Farmers Market on premises, with its convenient access to fresh produce and locally grown food; and (d) is located within the 100 year flood plain. Any development at the Green Street Site would therefore prove far more difficult, expensive and time-consuming.

120.     Further, the Mayor had no ability to even offer the Green Street Site as an alternative. Unlike Perkins Field, the Green Street Site was not owned by the City, but by a private individual with no contractual connection with the City. Unlike the City's control over Perkins Field, the City had no control over the Green Street Site: no option agreement with the landowner, and no capacity to convey any legal or equitable title to the Green Street Site to the Plaintiffs or any other party.

121.    However, despite this infirmity, the Mayor represented to the Plaintiffs that the City could have the land "donated" to the City by the landowner, and that the Plaintiffs should abandon their rights to Perkins Field in favor of this option. The land constituting the Green Street Site has been assessed by the Houston County, Georgia tax assessor as being worth nearly $200,000, and upon information and belief this is a reasonable approximation of its value. The Mayor has not disclosed how he would be able to convince the owner of the Green Street Site to make a $200,000 donation to the City; and, upon information and belief, no such donation to the City would have been forthcoming.

122.    The Mayor knew or should have known, at the time he made the "offer," that the Green Street Site was not in fact a feasible site at all for a mixed use development with an affordable housing component. The Mayor is lifelong resident of Warner Robins and a retired firefighter and is accordingly very familiar with the geography, topology and development patterns of Warner Robins. Therefore, the Mayor knew or should have known that the Green Street Site had never been developed, although the parcels immediately adjacent and across the street had been developed. And the Mayor knew or should have known the Green Street Site had never been developed because it was within the 100 year flood plain.

123.    The Green Street Site was not in a location which would have furthered the City's commitments and obligations to affirmatively further fair housing. The Green Street Site is not in an area of economic opportunity, but is physically and psychologically isolated from any economic opportunity areas. It is not within walking distance of the City's Commercial Corridor, and it is not served by any transit lines. The Green Street Site, moreover, would have violated the directives of the Houston County Plan for new affordable multi-family housing within easy walking distance of amenities and economic opportunity.

124.    Indeed, any new affordable multi-family housing at the Green Street Site would only serve to concentrate poverty and reinforce historic patterns of segregation and discrimination. The Green Street Site is a block or so away and across the street from the City's T.J. Calhoun public housing project. Although the T. J. Calhoun Project is unoccupied and under renovation, it is almost certain that its future tenants will share the same demographics of the other public housing projects operated by Warner Robins, which is overwhelmingly African-American and extremely poor. The Green Street Site is located within a census tract with very few residents, but it fronts Census Tract 020400-2, which is 62.5% African American and 15.7 white, in contrast to the Perkins Field census tract, 020400-1, which is 58-7% white, and 24.8% African American.

125.    The Mayor's offer for the Green Street Site was, instead, an attempt at "bait and switch," to deceive the Plaintiffs into giving up their contractual and other rights to redevelop Perkins Field, for another site which was completely unsuitable for building. This attempt at bait and switch is a further demonstration of the hostility of the Mayor and the City to the construction of affordable, fair housing within the City of Warner Robins near City Hall or areas of economic opportunity.

126.    The Plaintiffs rejected the Mayor's attempt at bait and switch, and continued to request that the City and the Development Authority honor their contractual and statutory obligations to the Plaintiffs for the Perkins Field Project.

127.    But after January 14, 2020, the Mayor failed to respond to emails or phone calls made by the Plaintiffs, or to agree to schedule a meeting with the Plaintiffs. Instead, the City Attorney told the Plaintiffs that the City Attorney had not performed, and would not perform any

of the ministerial acts necessary to secure the release of the DNR Grant, and that the City did not intend to do anything in the future to secure such release.

### C. THE PLAINTIFFS CONTINUE TO PRESS FOR THE COMPLETION OF THE PERKINS FIELD PROJECT

128.    The Plaintiffs' continued desire to complete the Perkins Field Project was communicated to the Mayor and City Council on February 3, 2020, when representatives of the Plaintiffs attended a closed session of the Mayor and City Council, at the invitation of a Council Member. This closed meeting was attended by the Mayor, by all but one of the City Council Members, and by the City Attorney. At that meeting, the Plaintiffs renewed their request to complete the Perkins Field Project, asking why Mayor was not responding to the Plaintiffs' request for a meeting and why the City was not moving forward with its obligations to complete the Perkins Field Project. The Mayor indicated that he had nothing to add during this meeting and refused to respond to the Plaintiffs' entreaties. Further, the City Attorney continued to refuse to work on gathering the necessary data to release the DNR Grant, in violation of the commitment made by the Mayor and the City Attorney in their January 8, 2020 meeting with the Plaintiffs.

129.    Consequently, on February 6, 2020, the Plaintiffs sent the Mayor a letter, asking the City and the Development Authority to live up to their contractual and legal commitments. Instead of responding to this letter, or addressing the substantive concerns raised by this letter, the Mayor and the City acted to attempt to "rescind" the City's obligations to the Plaintiffs.

### D. THE CITY ATTEMPTS TO "RESCIND" ITS CONTRACTUAL AND LEGAL OBLIGATIONS TO THE PLAINTIFFS

130.    Rather than addressing the Plaintiffs' substantive concerns, the Mayor and members of City Council took a completely different, and illegal, approach. On or about

February 28, 2020 the Mayor's office circulated an agenda for the March 2, 2020 meeting of the Mayor and City Council. That agenda included an item described as "Rescind Land Lease Agreement." Notably, that agenda item was only two items after the Mayor and City Council considered the City's "CDBG Five (5) year Consolidated Plan..." which required the City to affirmatively further fair housing in Warner Robins.

131.    The proposed Resolution to "Rescind Land Lease Agreement" (the "Rescission Resolution") stated in pertinent part:

> WHEREAS, on August 5, 2019, the Mayor and Council adopted the following resolution:
>> *"BE IT RESOLVED by the Mayor and Council of the City of Warner Robins authorize Mayor Randy Toms to execute the attached Development Agreement by and among the City of Warner Robins, Georgia, The Development Authority of the City of Warner Robins, Georgia and Woda Cooper Development, Inc. pending the grant being lifted."*; and
>
> WHEREAS, said "grant," being limitation of use related to the property known as Perkins Field and other recreation facilities, remains in place as of this date.
>
> NOW, THEREFORE, BE IT RESOLVED that the Mayor and Council of the City of Warner Robins rescind the said August 5, 2019 resolution in its entirety.

132.    This resolution was considered in violation of City Code §2-27, which adopted Robert's Rules of Order as the governing rules for the conduct of the meetings of the Mayor and City Council. The Rescission Resolution violated at least the following provisions of Robert's Rules of Order Newly Revised, 11th Edition ("Robert's Rules"):

(a) Section 37(b), which requires that any motion to rescind a prior resolution be made within the same session of Council. Since the 2019 session of Council ended with the November 2019 elections, the Rescission Resolution was untimely;

(b) Section 37(a), which requires that any motion to rescind a prior resolution can only be made by a member who voted with the prevailing side. The Rescission Resolution was sponsored by a Council Member who *was not even on City Council at the time*;

(c) The Rescission Resolution was out of order, since the provisions of that resolution had already been partially carried out, as set forth in this Complaint; see, Robert's Rules at page 318, line 29; and

(d) An affirmative vote in the nature of a contract cannot be undone when the other parties to the contract (here, the Plaintiffs and the Development Authority) have been notified of the outcome of the prior vote; see, Robert's Rules at page 319, line 1.

133.     Although the Rescission Resolution was tabled after one Council Member raised a point of order, the introduction of the Rescission Resolution demonstrated the true intent behind the refusal by the Mayor and the City Attorney (at the Mayor's explicit direction) to refuse to perform the ministerial tasks of their offices: in short, the Mayor and the City Attorney refused to fulfill their official duties, so that they could later use such refusal as an excuse to violate the City's contractual and statutory obligations to the Plaintiffs.

134.     On March 16, 2020, the Rescission Resolution was again taken up by the Mayor and the City Council. The Mayor, in violation of City Code Section 2-27, ruled that Robert's Rules of Order did not apply to the Mayor and City Council, that the point of order previously raised was not valid, and proceeded to cast the fourth vote in favor of the Rescission Resolution.

135.     The Rescission Resolution, combined with the deception and inactivity of the Mayor and City Attorney, establish that the City, through the direction of its policymaker and Chief Executive Officer, has a bad faith intent to deprive the Plaintiffs of their contractual and statutory rights to complete the Perkins Field Project.

## V.  THE ACTIONS OF THE CITY AND THE MAYOR WILL HAVE A DISPARATE IMPACT ON AFRICAN AMERICANS AND VIOLATE THE DUTY TO AFFIRMATIVELY FURTHER FAIR HOUSING

136.    The Perkins Field Project is intended to alleviate the shortage of affordable, quality housing in Warner Robins. The failure of the City to allow the Perkins Field Project will have a disparate impact on African Americans.

137.    Thus, any improvements in the housing stock or in the economic opportunity and activity in the area around Perkins Field would have a disproportionate effect on the African-American population of Warner Robins. And also, any actions taken to prevent the improvement of housing stock or economic opportunities and activities in the area around Perkins Field would also have a disproportionate effect on the African-American population of Warner Robins.

138.    The failure of the City to fulfill its obligations, whether by contract or statute, and to allow the completion of the Perkins Field proposed development, will have a disparate impact on African Americans in Warner Robins, in violation of the obligations of the City and the City's Development Authority to affirmatively further fair housing.

## VI.  THE ACTIONS OF THE CITY AND THE DEVELOPMENT AUTHORITY TO OBSTRUCT THE PLAINTIFFS RIGHT TO DEVELOP FAIR AND AFFORDABLE HOUSING

139.    The Plaintiffs have a constitutional, federal right to develop affordable housing at Perkins Field and to enjoy the rights and privileges afforded to them under their contracts with the City and the Development Authority.

140.    The Mayor is the "chief executive officer the head of the administrative branch" of the City's government and the Mayor exercises "supervision and control over all departments and agencies of the city unless otherwise provided….," pursuant to Section 2-301(b) of the Charter of the City. The Mayor is a policy maker for the City of Warner Robins.

141.    Likewise, the Mayor's authority and policy making powers for the City extend to the City's Development Authority, which (at all relevant times) responded to the Mayor's directives with regard to the obstruction and delay of the Perkins Field Project.

142.    The Mayor adopted a City policy of violating the rights of the Plaintiffs. His actions, from directing the Building Director not to issue a building permit, to misrepresenting the status of the DNR Questionnaire, to directing the City Attorney not to assist with the DNR Questionnaire, were all implemented as policy for the City.

143.    As the Mayor is the Chief Executive Officer of the City, the actions of the Mayor violating the rights of the Plaintiffs may fairly be said to be those of the City of Warner Robins and of the Development Authority.

144.    The Mayor knew that his actions would tend to deprive the Plaintiffs of their rights to develop affordable housing in Warner Robins using Low Income Housing Tax Credits.

## CAUSES OF ACTION

## COUNT I: BREACH OF CONTRACT BY THE DEVELOPMENT AUTHORITY

145.    The previous allegations in Paragraphs 1 to 144 of this Complaint are incorporated herein by reference.

146.    The Development Authority and the Plaintiffs have a valid and enforceable contract with respect to the Perkins Field Site, which includes the Development Authority's obligations under the Ground Lease Agreement.

147.    The Plaintiffs have fulfilled all of their obligations under their contract with the Development Authority, and are entitled to enforce the provisions of the Ground Lease Agreement.

148.    The Development Authority breached its obligations to the Plaintiffs under the Ground Lease Agreement by failing to lease the Perkins Field Site to the Plaintiffs.

149.    The Plaintiffs have incurred substantial damages as a result of the Development Authority's breach of its obligations under the Ground Lease Agreement.

150.    The Plaintiffs are entitled to recover their damages from the Development Authority for the Development Authority's breach of contract.

## COUNT II: BREACH OF CONTRACT BY THE CITY

151.    The previous allegations in Paragraphs 1 to 150 of this Complaint are incorporated herein by reference.

152.    The City and the Plaintiffs have a valid and enforceable contract with respect to the Perkins Field Site, which includes the Development Authority's obligations under the Ground Lease Agreement and the City's obligations to convey the Perkins Field Site to the Development Authority.

153.    The Plaintiffs have fulfilled all of their obligations under their contract with the City, and are entitled to enforce the provisions of that contract against the City.

154.    The City breached its contractual obligations to the Plaintiffs.

155.    The Plaintiffs have incurred substantial damages as a result of the City's breach of its contractual obligations.

156.    The Plaintiffs are entitled to recover their damages from the City for the City's breach of contract.

## COUNT III: VIOLATION OF THE FEDERAL FAIR HOUSING ACT, TITLE VIII OF THE CIVIL RIGHTS ACT OF 1968, 42 U.S.C. §3604(a)

157.    The previous allegations in Paragraphs 1 to 156 of this Complaint are incorporated herein by reference.

158.    The actions of the City and the Development Authority as described above will have a disproportionate adverse impact upon African-Americans and therefore violate the federal Fair Housing Act, which provides that it "shall be unlawful … [t]o make unavailable or deny .. a dwelling to any person because of race…" 42 U.S.C. §3604(a).

159.     The actions of the City and the Development Authority as described above are in violation of the duty to affirmatively further fair housing under the federal Fair Housing Act.

160.    These violations have harmed the Plaintiffs and for which the Plaintiffs are entitled to recover their damages.

## COUNT IV: VIOLATION OF THE GEORGIA FAIR HOUSING ACT

161.    The previous allegations in Paragraphs 1 to 160 of this Complaint are incorporated herein by reference.

162.    The actions of the City and the Development Authority as described above will have a disproportionate adverse impact upon African-Americans and therefore violate the

Georgia Fair Housing Act, which provides that it shall be unlawful to make unavailable or deny a dwelling to any person because of race.

163.    These violations have harmed the Plaintiffs and for which the Plaintiffs are entitled to recover their damages.

## COUNT V: VIOLATION OF THE WARNER ROBINS FAIR HOUSING ORDINANCE

164.    The previous allegations in Paragraphs 1 to 163 of this Complaint are incorporated herein by reference.

165.    The actions of the City and the Development, in violation of the Warner Robins Fair Housing Ordinances, codified at City Code Chapter 9, Article II, Section 9-26 et seq. (the "Fair Housing Ordinances"), have harmed the Plaintiffs and for which the Plaintiffs are entitled to recover their damages.

## COUNT VI: SPECIFIC PERFORMANCE AS TO THE CITY AND THE DEVELOPMENT AUTHORITY

166.    The previous allegations in Paragraphs 1 to 165 of this Complaint are incorporated herein by reference.

167.    The contracts between the Plaintiffs (on the one hand) and the City and the Development Authority (on the other) are valid and binding, and describe with certainty the land which was to be leased to the Plaintiffs. The Petition, and the Proposed Lease Agreement, disclose the terms of the contracts between the parties with such precision that the terms of those contracts could not be reasonably misunderstood.

168.    The Ground Lease Agreement identifies the property to be conveyed as 105 Mulberry Street, Warner Robins, Georgia, 31093, and provides the Parcel ID number, which is 0W014B 001000. The Petition and Complaint further described the property to be conveyed by

metes and bounds description, attached as Exhibit A to the Proposed Lease Agreement between the Development Authority and Perkins L.P.

169.    The Plaintiffs have provided consideration to the City and the Development Authority for the Ground Lease Agreement and the Proposed Lease Agreement. The Plaintiff have expended hundreds of thousands of dollars in complying with the conditions precedent to the Ground Lease Agreement.

170.    Further, the Plaintiffs have provided valuable improvements to, and information about, the Perkins Field Site to the Development Authority and the City. The geotechnical and environmental inspections and testing performed by the Plaintiffs, at a cost of tens of thousands of dollars, has disclosed to both the Development Authority and the City (a) that the Perkins Field Site is suitable for development as a mixed use property as part of the 2012 Redevelopment Plan and (b) that the suspected environmental issues with the Perkins Field Site will be manageable in the context of such a development. This newly developed and discovered information constitutes a valuable improvement to the Perkins Field Site, as this information enhances the value of the Perkins Field Site not just to the Plaintiffs but also to the Development Authority and to the City.

171.    The Plaintiffs are entitled to a judgment and order compelling the Development Authority and the City to specifically perform the terms of the contracts between the parties, including the performance of the Proposed Lease Agreement.

## COUNT VII: VIOLATION OF U.S. CONSTITUTION, ARTICLE I, SECTION 10, CL. 1; 42 U.S.C. SECTION 1983

172.    The previous allegations in Paragraphs 1 to 171 of this Complaint are incorporated herein by reference.

173.     Article I, Section 10, Clause 1 of the United States Constitution (the "Contracts Clause") provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

174.     The Contracts Clause applies to prohibit local governments from passing laws impairing the obligations of contracts.

175.     Section 1983 of the Civil Rights Act of 1871 ("Section 1983") creates a private right of action in federal court for deprivations/violations of federal rights at the hands of State and local government actors.  *See* 42 U.S.C. § 1983.

176.     Section 1983 affords individuals and entities harmed by a Contracts Clause violation an avenue to seek relief for their injuries in federal court.

177.     The rescission of the August 5, 2019 resolution by the City Council and the Mayor authorizing the lease with Plaintiffs impairs Defendants' contractual obligations to Plaintiffs, and thus gives rise to a Contracts Clause violation actionable under Section 1983.

178.     These actions by the Defendants have harmed the Plaintiffs, and for which the Plaintiffs are entitled to seek relief for their injuries.

**COUNT VIII: RECOVERY OF ATTORNEYS FEES FOR BAD FAITH**

179.     The previous allegations in Paragraphs 1 to 178 of this Complaint are incorporated herein by reference.

180.     The intentional, bad faith refusal by the City and the Development Authority to comply with their contractual duties to the Plaintiffs, and with their statutory obligations under both federal and Georgia laws, have caused the Plaintiffs unnecessary trouble and expense and have compelled the Plaintiffs to commence this lawsuit to enforce their rights.

181.   As this lawsuit was commenced because of the intentional bad faith of the City and the Development Authority, the Plaintiffs are entitled to recover their attorneys' fees and other expenses of litigation from the City and the Development Authority under OCGA §13-6-11.

182.   The Plaintiffs are entitled to a judgment against the City and the Development Authority, jointly and severally, under OCGA §13-6-11, for their attorneys' fees and other expenses of litigation in such amounts as will be proven at the trial of this cause.

**WHEREFORE**, the Plaintiffs request that this Court:

A. Award the Plaintiffs their damages for the breach of contract by the Development Authority, in such amount as proven at trial;

B. Award the Plaintiffs their damages for breach of contract by the City, in such amount as proven at trial;

C. Award the Plaintiffs their damages, including legal fees and expenses, for violation of the federal Fair Housing Act by the City and the Development Authority;

D. Award the Plaintiffs their damages, including legal fees and expenses, for violation of the Georgia Fair Housing Act by the City and the Development Authority;

E. Award the Plaintiffs their damages, including legal fees and expenses, for violation of the Warner Robins Fair Housing Ordinances by the City and the Development Authority;

F. Award the Plaintiffs their damages, including legal fees and expenses, for violation of the Duty to Affirmatively Further Fair Housing by the City and the Development Authority;

G. Award specific performance as to the City and the Development Authority, for the completion of the Perkins Field Project;

H. Award the Plaintiffs their damages, including legal fees and expenses, for violation of

Constitution and Section 1983 by the City and the Development Authority;

I. Award the Plaintiffs their attorneys fees pursuant to OCGA §13-6-11; and

J. Grant such other relief, whether legal or equitable, as is just and appropriate.

Respectfully Submitted,

/s/ Matt Shoemaker
R. Matthew Shoemaker
Georgia State Bar. No. 339367
**JONES CORK, LLP**
435 2nd Street, Suite 500
Macon, Georgia 31201
Phone: 478-745-2821
Fax: 478-743-9609
Email: matt.shoemaker@jonescork.com


**RENO & CAVANAUGH, PLLC**

Joseph R. Prochaska (TN BPR #12760)(*pro hac vice*
application to be filed)
Iyen Abdon Acosta (DC #1021060) (*pro hac vice*
application to be filed)
424 Church Street, Suite 2910
Nashville, TN 37219
Phone:  (629) 255-0208
Facsimile: (629) 255-0209
Email:  jprochaska@renocavanaugh.com
        iacosta@renocavanaugh.com

Attorneys for Plaintiffs