**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **WODA COOPER DEVELOPMENT, INC.,** *et al.*, ) ) ) | |
| **Plaintiff,** ) ) | |
| v. ) ) | **CIVIL ACTION NO. 5:20-CV-159 (MTT)** |
| **CITY OF WARNER ROBINS,** *et al.*, ) ) ) | |
| **Defendants.** ) ) | |

## ORDER

The City of Warner Robins and Mayor Randy Toms move to dismiss the plaintiffs' second amended complaint (Doc. 38).  Doc. 42.  Separately, the Development Authority of Warner Robins also moves to dismiss the second amended complaint.  Doc. 41.  For the following reasons, the Development Authority's motion (Doc. 41) is **GRANTED**, and the City and the Mayor's motion (Doc. 42) is **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

In their second amended complaint ("SAC"), the plaintiffs allege that the defendants reneged on agreements that would have allowed the plaintiffs to build a mixed-use development that included affordable housing on a site in downtown Warner Robins known as Perkins Field.  The plaintiffs allege that the defendants first encouraged the plaintiffs to consider Perkins Field, and when they found the site acceptable, strongly supported the plaintiffs' development efforts for well over a year.

Then, the plaintiffs allege, the City and the Mayor abruptly blocked the development for reasons based on race.

In 2017, the City's Director for Economic Development met with the plaintiffs' representatives to encourage them to develop affordable housing in Warner Robins. Doc. 38 ¶ 68.  The City had acknowledged the existence of "significant issues of racial segregation" in the City, had recognized the need for more affordable housing, and had vowed to increase housing availability.  *Id*. ¶¶ 20-26.  The shortage of affordable housing had a disproportionate impact on African Americans, who constitute 34.3% of the city's population but make up 88% of existing public housing residents.  *Id*. ¶ 27. The plaintiffs further allege that housing costs burden African American households in Warner Robins far more heavily than white households.  *Id*. ¶¶ 28-29.

On January 16, 2018, representatives of the City and the Development Authority met with the plaintiffs to further encourage them to build affordable housing in Warner Robins.  *Id*. ¶ 69. At the City and the Development Authority's behest, the plaintiffs unsuccessfully attempted to purchase land located three blocks from Warner Robins's city hall.  *Id*. ¶ 70.  The City and the Development Authority then encouraged the plaintiffs to build on Perkins Field, a site "within steps" of city hall.  *Id*. ¶ 73.  Perkins Field is a former baseball field in downtown Warner Robins that the City had used before constructing a new sports complex.  *Id*. ¶ 72.  Because the City no longer used Perkins Field, it was considered surplus property available for any governmental purpose.  *Id*. ¶¶ 72-73.

On April 16, 2018, the plaintiffs met with the Mayor and the Warner Robins City Council, all of whom expressed support for the Perkins Field development.  *Id*. ¶ 75.  A

"Concept Plan" was then developed, outlining details of the development and the need for, among other things, the City or the Development Authority to lease Perkins Field to the plaintiffs.  *Id*.  The Plan contemplated that the Perkins Field development would be funded by industrial revenue bonds, low-income housing tax credits ("LIHTCs"), and equity from the plaintiffs.  *Id*. ¶ 76.  The Development Authority agreed to proceed.  *Id*. ¶ 77.  In a May 7, 2018 meeting, the Mayor and the Council also "spoke approvingly" of the Concept Plan and authorized the plaintiffs to proceed and submit an application for LIHTCs to the Georgia Department of Community of Affairs.  *Id*. ¶ 78.  The City also confirmed that Perkins Field was properly zoned for the mixed-use development and that there would be no regulatory obstacles to the development.  Docs. 38 ¶ 79; 38-2.

On May 22, 2018, the Development Authority and Perkins Field, L.P.[1] entered a "Ground Lease Agreement" granting Perkins Field, L.P. an option to lease the Perkins Field site.  Docs. 38 ¶ 80; 38-3 at 2-4.  The agreement was "subject to" the City conveying Perkins Field to the Development Authority for lease to Perkins Field, L.P.  Doc. 38-3 at 1.  For its part, Perkins Field, L.P. had to obtain all governmental approvals, licenses, permits, any other necessary approvals, and a LIHTC award from the Georgia Department of Community Affairs.  Docs. 38 ¶ 81; 38-3 at 3-4.

On May 22 and 23, 2018, the City and the Development Authority provided the plaintiffs with materials needed to complete an environmental questionnaire that was to be a part of the development's financing application.  Docs. 38 ¶¶ 83-85; 38-4.  The City then granted "site control" to the plaintiffs for their LIHTC application.  Doc. 38 ¶ 88.

---

[1] Perkins Field, L.P. was created specifically for the Perkins Field development.  Doc. 38 ¶ 16.  Perkins Field, L.P. was to receive the LIHTCs to help fund the Perkins Field development.  Doc. 38-3 at 2-4.

This, the plaintiffs allege, is significant because they could not have applied for LIHTCs unless the City, as the owner of Perkins Field, agreed to the lease. *Id*.

On May 23, 2018, the plaintiffs secured bank financing of over $13,000,000. *Id*. ¶ 89. The bank also agreed to invest equity in the development. *Id*. The next day, the plaintiffs submitted their LIHTC application, and on November 19, 2018, the Georgia Department of Community Affairs informed the plaintiffs that they had qualified for an annual tax credit of $936,000. Docs. 38 ¶ 91; 38-5.

In December 2018, the parties held a pre-construction meeting to discuss what was needed to complete the Perkins Field development. Doc. 38 ¶ 99. By February 2019, the building plans for the development had been submitted for approval. *Id*. ¶ 102. The parties then began drafting a "Development Agreement" which specified the terms of the parties' agreements, including the terms of the lease for Perkins Field. *Id*. ¶ 103. On June 11, 2019, the City Engineer approved the plaintiffs' building plans. *Id*. ¶ 110. The next month, the City's Building and Transportation Director gave his approval. Docs. 38 ¶ 111; Doc. 38-7. By that point, the plaintiffs had spent over $1,000,000 fulfilling their contractual obligations to develop Perkins Field. Doc. 38 ¶ 112.

By August 1, 2019, the plaintiffs allege that they had "fulfilled each of the conditions precedent in the Ground Lease Agreement such that the plaintiffs were entitled to lease Perkins Field from the Development Authority." *Id*. ¶ 113. Accordingly, on August 5, 2019, the Mayor and City Council adopted a resolution "directing" the Mayor to "sign the lease of" Perkins Field. *Id.* ¶ 114. This resolution also approved the Development Agreement the parties had previously negotiated. *Id*.

The day after the adoption of the Commitment Resolution, the plaintiffs attempted to pay utilities fees and collect the building permit.  *Id.* ¶ 134.  The plaintiffs allege that the Mayor had instructed city employees not to release utilities taps or building permits, and the City's Transportation Director informed the plaintiffs that the permits would not be issued until the Mayor had signed the lease, and that would not happen until "the DNR grant was released."  Docs. 38 ¶ 134; 38-9.  This, the plaintiffs allege, was the result of the Mayor's secret decision to "renege on the contractual and statutory commitments of the City and Development Authority to the plaintiffs."  *Id.* ¶ 135.  Specifically, the plaintiffs claim, the Mayor, "through his own misfeasance," decided to sabotage the Perkins Field development.  *Id.* ¶ 135.

The plaintiffs allege that initially, the misfeasance centered on the DNR grant. The Commitment Resolution had directed the Mayor to sign the lease "pending the grant being lifted."  *Id.* ¶ 114.  The DNR grant was a small financial contribution from the Georgia Department of Natural Resources made more than fifty years earlier to help fund the construction or maintenance of Perkins Field.  *Id.* ¶ 115.  The plaintiffs allege that lifting the grant simply required the grant to be transferred to the new sports complex and that required "only certain administrative, ministerial acts by the Mayor or at the direction of the Mayor."  *Id*. ¶ 116.  It was in the discharge, or non-discharge, of those ministerial acts that the Mayor, throughout the fall of 2019 and into early 2020, "deceived" the plaintiffs.  *Id.* ¶ 136.

Unaware of the Mayor's alleged machinations but concerned by the delay, the plaintiffs met with the DNR to ascertain what was needed to lift the grant.  *Id.*  Armed with a list of necessary items, the plaintiffs met with the City Attorney on December 11,

2019 to discuss the status of the grant release, but the plaintiffs were told that the Mayor had not authorized any work on the matter. *Id*. ¶ 137. On January 8, 2020, the plaintiffs met with the Mayor and the City Attorney, but again the City Attorney stated that he had not been authorized to work on the issue. *Id*. ¶ 138. "Right there and then," the Mayor, after receiving the plaintiffs' list of what was needed to lift the grant, told the plaintiffs that he would authorize the City Attorney to send the necessary documents to the DNR. *Id*.

But also during that January 8 meeting and despite his "false promises" to lift the DNR grant, the Mayor asked the plaintiffs to consider a different location for the development. *Id*. ¶ 141. Notwithstanding their considerable investment in the Perkins Field site, the plaintiffs inspected the new location and learned that it was unsuitable for multiple reasons. *Id*. ¶ 142. First, the site was isolated from downtown and economic opportunities and was within the one-hundred-year flood plain. *Id*. ¶ 143. Second, the City did not even own the land, and the Mayor had no plan to acquire the land from the owner. *Id*. ¶¶ 144-146. Third, the location was close to existing public housing, which was overwhelmingly African American and poor. *Id*. ¶ 148. In short, the Mayor's proposed alternative site "would only serve to concentrate poverty and reinforce historic patterns of segregation and discrimination." *Id*.

The plaintiffs allege that the Mayor's proposal was a "bait and switch" effort to deceive the plaintiffs into giving up their legal right to develop Perkins Field. *Id*. ¶ 149. Thus, the plaintiffs rejected "the Mayor's attempt at bait and switch" and asked the defendants to "honor their contractual and statutory obligations to the Plaintiffs for the Perkins Field Development." *Id*. ¶ 151. But the Mayor ignored the plaintiffs, and the

City Attorney informed them that he had not performed and would not "perform any of the ministerial acts necessary to secure the release of the DNR Grant, and that the City did not intend to do anything in the future to secure such release." *Id*. ¶ 152.

In the meantime, the necessary bond resolution had been completed and by December 5, 2019 was ready for approval. *Id*. ¶ 117.  But the City and the Development Authority refused to consider approving the resolution unless the plaintiffs paid the City and the Development Authority's attorney's fees, some $139,238, before 4 p.m. on December 5. *Id*. ¶¶ 117-118.  The plaintiffs wired the money, and the Development Authority approved the resolution. *Id*. ¶¶ 119-120.

But the Mayor ignored the plaintiffs, and the City Attorney refused to do anything to get the DNR grant released. *Id*. ¶ 152.  On February 3, 2020, at the invitation of a City Councilperson, the plaintiffs met with the Mayor and City Council. *Id*. ¶ 153.  Still, the Mayor refused to answer any questions, and the City Attorney again refused to act to lift the grant. *Id*.  On February 6, the plaintiffs demanded that the City and the Development Authority uphold their side of the bargain. *Id*. ¶ 154.  But instead of responding to that letter, the Mayor orchestrated, illegally according to the plaintiffs, a March 16, 2020 City Council vote rescinding the Commitment Resolution. *Id*. ¶¶ 114, 155-160.  The Mayor cast the deciding vote. *Id*.  That meant that the City would not convey Perkins Field to the Development Authority, and thus, the Development Authority could not lease the site to Perkins Field, L.P.

But to hammer the nail in the coffin, as the plaintiffs put it at oral argument, the Mayor also took steps to defund the Development Authority and thus hamstring its ability to pursue *any* affordable housing development, not just Perkins Field. *Id*. ¶ 128.

Voting along racial lines, and with the Mayor again casting the deciding vote, the City voted to divert from the Authority car rental tax funds, which make up most of the Authority's funding.  *Id*.  With this vote, the Mayor said that he "hoped that the Development Authority was not successful."  *Id*. ¶ 129.

The plaintiffs allege that the Mayor's sabotage of the Perkins Field development arose from racial animus.  Specifically, as the development became a reality, some members of the community organized to oppose the development.  *Id*. ¶ 133.  The plaintiffs were repeatedly told by a City lobbyist that significant opposition came from members of the community who "did not want low income at this location."  *Id*.  Other "coded language" such as "government housing" and "rising crime rates" was used in political campaigns against the development.  *Id*.  The opposition continues, the plaintiffs claim, with some community members stating that they "don't want low rent apartments [in Warner Robins] end of story," while others have advocated for moving the development to an "isolated location," which would impose further financial burdens on residents.  *Id*.  Also, and of questionable relevance, the plaintiffs allege numerous unrelated acts and transactions that illustrate, according to the plaintiffs, the Mayor's racial animus.  *Id*. ¶¶ 121-131.

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure require that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To avoid dismissal pursuant to Rule 12(b)(6), a complaint must contain sufficient factual matter to "'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544,

570 (2007)).  A claim is facially plausible when "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible."  *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (internal quotation marks and citations omitted).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  *FindWhat Inv'r Grp. v. FindWhat.com.*, 658 F.3d 1282, 1296 (11th Cir. 2011) (internal quotation marks and citations omitted).  But "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  *Wiersum v. U.S. Bank, N.A.,* 785 F.3d 483, 485 (11th Cir. 2015) (internal quotation marks and citation omitted).  The complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).  Where there are dispositive issues of law, a court may dismiss a claim regardless of the alleged facts.  *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1321 (11th Cir. 2018) (citations omitted).

### III. DISCUSSION

The SAC asserts (a) a breach of contract claim against the Development Authority; (b) a federal Fair Housing Act disparate impact claim against the City, the Mayor, and the Development Authority; (c) a federal Fair Housing Act disparate treatment claim against the City and the Mayor and perhaps, it is not clear, against the Development Authority; (d) Georgia Fair Housing Act claims against all three

defendants; (e) a claim for specific performance against the City and the Development Authority; and (f) a Contract Clause claim against the City and the Mayor.[2]

The Court addresses first the claims against the Development Authority and then the claims against the City and the Mayor.

## A. Claims against the Development Authority

In its motion to dismiss, the Development Authority argues that the SAC fails to state a breach of contract claim[3] and, it necessarily follows,[4] a specific performance claim; fails to state claims under the FHA and GHA; and is a shotgun pleading. *See generally* Doc. 47.  The Court agrees that the SAC, to the extent that it attempts to allege liability on the part of the Development Authority, is a shotgun pleading.  But more fundamentally, in its 215 paragraphs, the SAC never factually gets around to alleging a plausible, or even a discernable, claim of any sort against the Development Authority.  On the contrary, the factual allegations of the SAC make clear that the plaintiffs do not, as yet, have a claim against the Development Authority.

The first 120 paragraphs of the SAC provide a detailed history of the Perkins Field development up to when the Mayor began his alleged campaign to scuttle the development.  The plaintiffs then began to allege the actionable conduct giving rise to

---

[2] The plaintiffs also asserted a tortious interference claim against the City and the Mayor (Doc. 38 ¶¶ 208-215) but moved to dismiss that claim without prejudice on February 9, 2021.  Doc. 58.  That motion is **GRANTED**, and the plaintiffs' tortious interference claim is **DISMISSED without prejudice**.

[3] In its reply brief, the Development Authority also argues that the Ground Lease Agreement is an "unenforceable agreement to agree."  Doc. 47 at 2-4.  That is questionable at best, but the Court need not reach that issue.

[4] The plaintiffs note that the Development Authority does not mention in its motion to dismiss the plaintiffs' specific performance claim, leading the plaintiffs to argue that the failure to challenge that claim precludes its dismissal.  Doc 43 at 4-5.  While the Development Authority should have acknowledged, and addressed, the plaintiffs' specific performance claim, the Development Authority's arguments necessarily implicate that claim.

their claims.  Section IV of the SAC, titled *The Racial Animus of Mayor Toms Towards African Americans Infects Warner Robins and Becomes City Policy*, alleges no wrongdoing by the Development Authority.  Doc. 38 ¶¶ 121-131.  On the contrary, it is in this section that the plaintiffs allege that the Development Authority also became a casualty of the Mayor's campaign against the Perkins Field development when he orchestrated the vote to divert the Authority's funding.  *Id.* ¶¶ 128-29.

In Section V, titled *The City Suddenly Reneges on its Promises to the Plaintiffs*, the plaintiffs allege that the Mayor and the City stopped the Perkins Field development, that the Mayor's offer of an alternative site was a bait and switch effort, and that the City attempted to rescind its contractual and legal obligations to the plaintiffs.  *Id.* ¶¶ 132-160.  There is no mention of the Development Authority.

In Section VI, titled *The Actions of the City and the Mayor Will Have a Disparate Impact on African Americans and Violate the Duty to Affirmatively Further Fair Housing*, the plaintiffs again level various allegations against the City and the Mayor but not against the Development Authority.  *Id.* ¶¶ 161-169.  The plaintiffs do, in paragraph 169—and this is perhaps a drafting error—allege that the "City and the City's Development Authority have no legally sufficient justification for *its* bad faith actions regarding the Perkins Field Development."  *Id.* ¶ 169 (emphasis added).  To the extent this was an effort to allege misconduct on the part of the "City's Development Authority," it fails.  It is a summary of the allegations in the preceding paragraph, which allege no wrongdoing on the part of the Development Authority.  And given the use of the singular "its," it is unlikely that any such allegation was intended.

Finally, in Section VII, titled *The Actions of the Mayor, the City and the Development Authority Obstruct the Plaintiffs' Right to Develop Fair and Affordable Housing,* it appears that the plaintiffs at least intended to implicate the Development Authority, but exactly how cannot be discerned.  *Id*. ¶¶ 170-175.  The allegations in Section VII are aimed squarely at the Mayor.  In paragraph 172, the plaintiffs make the bald allegation that "the Mayor's authority and policy making powers for the City extend to the City's Development Authority, which (at all relevant times) responded to the Mayor's directives with regard to the obstruction and delay of the Perkins Field Development."  *Id*. ¶ 172.  But nowhere do the plaintiffs allege the basis for the assertion that the Mayor's "authority and policy making powers" extend to the Development Authority, an entity distinct from the City.  *Id*. ¶ 19.  More importantly, nowhere in the SAC do the plaintiffs allege that the Mayor issued, much less that the Development Authority responded to, directives to the Authority to obstruct and delay the Perkins Field development.  Just as baldly, the plaintiffs allege in paragraph 174 that the Mayor's violation of their rights "may fairly be said to be those of … the Development Authority."  *Id*. ¶ 174*.*  But again, the plaintiffs never allege how it can be said, fairly or otherwise, that the Mayor's alleged misdeeds are also misdeeds by the Development Authority.

The counts alleged against the Development Authority are even less revealing, and more confusing, than the plaintiffs' factual allegations.  In Count I, the plaintiffs allege that the Development Authority breached the Ground Lease Agreement "by failing to lease the Perkins Field site to the Plaintiffs."  *Id*. ¶ 179.  In direct contradiction to that assertion, the SAC alleges the Authority's contractual obligation to lease Perkins

Field to Perkins Field, L.P. was "subject to the conveyance of [Perkins Field] by the City to the Authority," and the Mayor prevented the City from doing that.  Docs. 38 ¶¶ 155-60; 38-3 at 2.  The SAC makes no effort to explain how, under these circumstances, the Authority could have leased property it did not own.

In Count II, which alleges the plaintiffs' FHA disparate impact claim, the plaintiffs simply allege that the "actions of the Mayor, the City, and the Development Authority as described above will have a disproportionate adverse impact upon African Americans." Doc. 38 ¶ 183.  Never does the SAC allege any "actions" by the Development Authority causing a disparate impact upon African Americans.  Count IV alleges a violation of the Georgia Fair Housing Act.  It mirrors Count II and suffers from the same defects.

The plaintiffs' FHA disparate treatment claim is asserted in Count III and is even more confusing.  Count III alleges the "actions of the Mayor and the City as described above were done with a discriminatory intent toward African Americans."  *Id.* ¶ 187. This suggests that the plaintiffs did not intend to assert an FHA claim against the Development Authority, which makes sense because the plaintiffs never alleged conduct by the Development Authority violating the FHA.  But in the next paragraph, the plaintiffs allege that the "actions of the Mayor, the City, and the *Development Authority* as described above" violated the FHA.  *Id.* ¶ 188 (emphasis added).  Perhaps the omission of the Development Authority from paragraph 187 was a mistake—if so, a Freudian one.  But if the omission was a mistake, the SAC nowhere alleges facts supporting a disparate treatment claim against the Development Authority.

Finally, in Count V, the plaintiffs allege a claim for "specific performance as to the City and the Development Authority."  Doc. 38 ¶ 193-99.  In this count, the plaintiffs

seek to force the Development Authority to lease the Perkins Field site to Perkins Field, L.P. under the Ground Lease Agreement.  Docs. 38 ¶ 193-99; 38-3.  But as with their breach of contract claim, the plaintiffs do not allege how the Development Authority has breached the Ground Lease Agreement, much less how the Court can order the Development Authority to lease property it does not own.

In short, nowhere in their scattershot allegations against the Development Authority do the plaintiffs plausibly allege any claims against the Development Authority. But in their brief, the plaintiffs offer two arguments to remedy the SAC's shortcomings.[5] Of course, arguments in a brief are not allegations in a complaint, but the Court considers them, nonetheless.

First, the plaintiffs argue that the Development Authority had a duty of good faith to somehow force the City to convey Perkins Field.  Doc. 43 at 7.  But nowhere in the SAC do the plaintiffs allege the existence of such a duty or any facts suggesting that the Development Authority, in bad faith or otherwise, failed to force the City to convey Perkins Field.  For that matter, the plaintiffs fail to allege how the Authority could even attempt to force the conveyance.  Instead, the plaintiffs' response brief trots out the allegations discussed above, particularly their conclusory allegation that the Development Authority "'responded to the Mayor's directives' to obstruct and delay the Perkins Field Development."  Docs. 43 at 8; 38 ¶ 172.  The plaintiffs never allege what the Mayor directed the Development Authority to do or what the Development Authority

---

[5] Actually, the plaintiffs offer three arguments for keeping the Authority in the case.  The third, tellingly, they raise first—they implore the Court not to dismiss the Authority because its presence is necessary for the plaintiffs to obtain complete relief.  Doc. 43 at 4-6.  If the plaintiffs prevail in their claims against the City and the Mayor, and if the relief they receive includes the conveyance of Perkins Field to the Authority, and if the Authority balks at leasing Perkins Field, then the Court can deal with that issue.  But keeping a party around against whom no viable claim is alleged because of the prospect that a series of "ifs" may come to pass is not appropriate.

did to obstruct and delay the Perkins Field development.  Thus, even if the
Development Authority had some sort of a duty of good faith, the plaintiffs never allege
how the Development Authority breached that duty.

Second, the plaintiffs argue that "the Development Authority has vicarious liability
for the actions of the City and the Mayor, done in connection with the Perkins Field
Development."  Doc. 43 at 13.  This vicarious liability arises, the plaintiffs argue, from
the City's and the Authority's "joint enterprise."  *Id*.  This, at least, implicitly
acknowledges the plaintiffs' failure to allege any actions by the Development Authority
giving rise to liability.  But again, the SAC does not allege a joint enterprise, and it
certainly does not allege a joint enterprise of a nature that renders one party to the
enterprise responsible for the misconduct of another.  Most significantly, the SAC does
not allege the key to vicarious liability among parties in a joint enterprise—mutual
control.[6]  *See Rossi v. Oxley*, 269 Ga. 82, 83 (1998) (holding that "[w]ithout the element
of mutual control, no joint venture can exist).

In sum, the SAC does not state a claim against the Development Authority, and
nothing in the plaintiffs' brief cures that fatal defect.  Accordingly, the plaintiffs' claims
against the Development Authority are **DISMISSED without prejudice**.

---

[6] The plaintiffs, citing *City of Eatonton v. Few*, 189 Ga. App. 687 (1988), argue that a joint enterprise may
exist even though a showing of profit motive and mutual control are otherwise lacking.  Doc. 43 at 14.
However, the holding in *Few* is narrow and limited to instances where the Georgia Constitution authorizes
a joint agreement such that a joint venture is obvious.  In *Few*, the Georgia Constitution authorized a joint
agreement between Putnam County and the City of Eatonton.  *Few*, 189 Ga. App. at 690.  Here, there is
no applicable provision from the Georgia Constitution that authorizes a joint venture between the
Development Authority and the City of Warner Robins, removing the need for mutual control.  Absent
such a showing, the Development Authority is not engaged in a joint venture with the City of Warner
Robins.

**B. Claims against the City of Warner Robins and Mayor Randy Toms**

**a.  FHA and GHA Disparate impact claims**

To the extent there is merit to the City and the Mayor's contention that the SAC is a shotgun pleading, that merit is found in the plaintiffs' efforts to allege a disparate impact claim under the FHA and GHA in Counts II and IV of the SAC.  Doc. 38 ¶¶ 182-185, 190-192.  To a point, that is understandable—since the Supreme Court's decision in *Tex. Dep't. of Hous. and Cmty. Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519 (2015), courts have struggled to determine just what it takes to allege a disparate impact theory of liability.  But this much is clear.  To allege a disparate impact claim, a plaintiff must identify a policy or practice that, although facially neutral, has been implemented or applied in a way that has had an improper disparate impact.  *Id*. at 527.  Further, the causal connection between the policy and the harm must be "robust."  *Id.* at 542. (citations omitted).  Just what "robust causality" means is very much a work in progress,[7] but *Inclusive Communities* tells us that racial imbalance alone does not establish a prima facie case of disparate impact and that requiring robust causality should protect "defendants from being held liable for racial disparities they did not create."  *Id.* (citations omitted).  Particularly relevant here, the Supreme Court cautioned against inferring from a "one-time decision" a policy causing a disparate impact.  *Id*. at 543.  First, a one-time decision may well not even be a policy, and second, establishing robust causality would be difficult because a variety of factors may be relevant to that one-time decision.  *Id.*

---

[7] *See Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 903-09 (5th Cir. 2019) (reviewing the efforts to define "robust causality").

Here, it is difficult—the City says impossible—to discern from the SAC the plaintiffs' alleged prima facie case of disparate impact liability. The plaintiffs' brief does a better job. Doc. 46 at 10-15. Once again, the Court cautions that a brief cannot cure pleading deficiencies, but the Court has assumed that the plaintiffs' brief faithfully summarizes the prima facie case they allege in the SAC. The City, the plaintiffs argue, has a policy of conveying publicly owned land to private developers for the purpose of constructing affordable housing. Docs. 38 ¶¶ 94-98; 46 at 8-9, 14-15. This policy, the argument continues, has been implemented in a way that confines affordable housing to areas outside of downtown Warner Robins and away from areas of economic opportunity. Doc. 46 at 8-9, 14-15. The City's actions, the plaintiffs argue, have had a disparate impact on African Americans. *Id*. at 14-15. Finally, the plaintiffs argue that when the City reneged on the Perkins Field development and attempted to move the development to other locations, they were acting in furtherance of that policy. *Id.* at 15.

To avoid *Inclusive Communities*'s fatal "one-time decision" label, the plaintiffs point to what they call two previous Warner Robins affordable housing developments— the Pennrose development.[8] Doc. 38 ¶¶ 44-51. The problem for the plaintiffs is that the SAC does not allege that the City caused the Pennrose development to be sited outside of downtown and in an area offering less economic opportunity. Consequently, at oral argument, the Court pressed counsel on this point.

> Court: But yet in your complaint, I read it to allege that the developer
> there agreed to the location there. I mean do you allege that the
> development there … was shunted away from downtown by the city? Do
> you think you've plausibly alleged that?

---

[8] It is debatable whether the Pennrose Development is two separate projects. Arguably, it is one project in two phases. Doc. 38 ¶¶ 44-51.

Counsel:  No, Your Honor.  We don't allege that.  We don't allege that the two Pennrose projects nor that the two failed projects that the city had also sponsored were shunted away from downtown.  It is just that at this stage, all we see is our project that's being shunted away from downtown.

Counsel's candor is appreciated.  It is also fatal to the plaintiffs' disparate impact claim.  Even assuming they have identified a policy—the City providing land for the development of affordable housing—the plaintiffs have not alleged that the City implemented the policy in a way that caused a disparate impact of any sort, much less the disparate impact they allege here, *i.e.*, "shunting" affordable housing developments to less desirable areas of Warner Robins.  In the end, the plaintiffs have only alleged a one-time decision—that the City and the Mayor acted in a discriminatory way when they reneged on their promises and obligations and tried to force the plaintiffs to develop in a less desirable area.

In sum, the plaintiffs have not plausibly alleged a policy or procedure having a disparate impact.  Even if they had, the plaintiffs have not plausibly alleged a "robust" causal connection between a policy or practice and the harm to African Americans they allege.  Accordingly, the plaintiffs' disparate impact claim is **DISMISSED without prejudice**.

### b.  FHA and GHA Disparate treatment claims

In Count III, the plaintiffs allege that the Mayor and the City acted "with a discriminatory intent toward African Americans and therefore violated the federal Fair Housing Act."  Doc. 38 ¶ 187.  Count IV alleges an identical GHA claim.[9]  Like Title VII claims, FHA disparate treatment claims can be proved by direct evidence or by

---

[9] The Georgia Fair Housing Act is analyzed under federal Fair Housing Act standards.  *Stewart v. McDonald*, 334 Ga. App. 461 (2015); *Bailey v. Stonecrest Condominium Ass'n, Inc.*, 304 Ga. App. 484 (2010).  Therefore, the Court's ruling on the plaintiffs' FHA claims applies to their GHA claims.

circumstantial evidence analyzed through the burden-shifting *McDonnell Douglas* framework.  *Quality of Life, Corp. v. City of Margate*, 805 F. App'x. 762, 767 (11th Cir. 2020) (citing *Hallmark Devs., Inc. v. Fulton Cty.*, 466 F.3d 1276, 1283 (11th Cir. 2006); *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 920 (10th Cir. 2012) (applying *McDonnell Douglas* to FHA claims)).  The need for circumstantial evidence theories of liability is no less apparent in housing discrimination than it is in employment discrimination.

> Because explicit statements of racially discriminatory motivation are decreasing, circumstantial evidence must often be used to establish the requisite intent.  Among the factors that are instructive in determining whether racially discriminatory intent is present are: discriminatory or segregative effect, historical background, the sequence of events leading up to the challenged actions, and whether there were any departures from normal or substantive criteria.

*Hallmark*, 466 F.3d at 1283-84 (quoting *United States v. Hous. Auth. of the City of Chickasaw*, 504 F. Supp. 716, 727 (S.D. Ala. 1980) (citations omitted)).

Neither the Court nor the parties have found authority articulating the elements of a prima facie case when a developer contends that local governmental decisions violated the FHA.  The Eleventh Circuit's decision in *Hallmark*, which the plaintiffs cite as an illustration of a direct evidence case, probably is a better example of a mosaic circumstantial theory akin to that employed in Title VII cases.  *See Smith v. Lockheed-Martin, Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  However, based on the facts alleged here, it is not necessary to weigh the allegations in the SAC, or to parse too vigorously the precise features of direct evidence or circumstantial evidence theories of liability.  That is because the Court quite comfortably concludes that the plaintiffs have plausibly alleged FHA and GHA disparate treatment claims.

If the plaintiffs simply had sought rezoning, or in some other way asked the City's permission to develop affordable housing, and if the City had just as simply denied permission, it is unlikely that the plaintiffs could have stated claims under the FHA and the GHA.  Such a "one-time decision" on an otherwise clean slate almost certainly could not allow the slightest inference of intentional discrimination.  That, of course, is not what allegedly happened here.  Having stated the facts in full, the Court will not belabor the point.  It is sufficient to say that the City and the Mayor, for an extended time, enthusiastically solicited and embraced the plaintiffs' efforts to develop affordable housing at Perkins Field, raising not a concern.  Step after step in the elaborate process of bringing to fruition tax-incentivized affordable housing development was navigated through the efforts of the City and the plaintiffs' convivial partnership.  In short, the City rolled out the red carpet in almost every conceivable way for the plaintiffs.

Thus, the slate is not clean.  For the development to reach the stage that it did, the myriad legitimate reasons that might have led the City to rebuff the plaintiffs' development efforts vanished.  Only when, according to the plaintiffs, there surfaced opposition to the 'elements' that affordable housing would bring to downtown Warner Robins did the City decide to roll up the red carpet.  Clearly, if the allegations in the SAC are believed, the City's about-face had a discriminatory effect because most consumers of affordable housing are African American.  The sequence of events leading to that about-face strongly suggests that the City succumbed to political pressure arising from racial animus.  And in the absence, as there necessarily is at this stage of the pleadings, of any explanation for this most unusual turn of events, the SAC plausibly

alleges facts inferring departures from normal or substantive criteria.  That is enough to plausibly allege FHA and GHA disparate treatment claims.

Accordingly, the City and the Mayor's motion to dismiss the plaintiffs' FHA and GHA disparate treatment claims is **DENIED**.

### c.  Specific performance claim

In Count V, the plaintiffs allege valid "contracts between the Plaintiffs … and the City and the Development Authority."  Doc. 38 ¶ 194.  In an earlier version of their complaint, the plaintiffs alleged a claim for breach of contract against the City, but the SAC, quite properly, drops that claim—nowhere in their factual allegations do the plaintiffs allege a contract between any of the plaintiffs and the City.  *Id*.  Presumably, the suggestion in paragraph 194 that such a contract exists is an irrelevant relic of that earlier complaint.  *Id*. ¶ 194.  Having no contract claim against the City, it necessarily follows that the plaintiffs cannot allege a claim for specific performance.  O.C.G.A. § 23-2-130; *see also Bagwell v. Trammel*, 297 Ga. 873, 875 (2015) (citation omitted) ("As a general rule, a party to a contract may seek specific performance of a contract upon a showing that damages recoverable at law would not constitute adequate compensation for another parties' nonperformance.").

The plaintiffs do not dispute this but nonetheless argue, as they did with the Development Authority, that their specific performance claim survives because "the City and the Mayor[10] are 'necessary parties' within the meaning of Fed. R. Civ. P. 19."  Doc. 46 at 25.  This argument fails.  Whatever Rule 19 does or allows, it does not give rise to a claim for specific performance, or any other substantive claim for that matter.  Of

---

[10] Actually, the Mayor is not a party to the plaintiffs' specific performance claim.

course, the Court understands the plaintiffs' valid point—to get relief the City must convey Perkins Field to the Development Authority, or the City and the Mayor must compensate them for the damages resulting from the City's failure to do so.  But that has nothing to do with Rule 19.  If the plaintiffs can establish it has viable claims against the City and the Mayor, the success or failure of those claims will determine the available relief, not Rule 19.

Accordingly, the plaintiffs' claim for specific performance is **DISMISSED without prejudice**.

### d.  Contract Clause claim

In Count VI, the plaintiffs allege a claim against the City and the Mayor under the Contract Clause of the United States Constitution.  U.S. Const. art. I, § 10, cl. 1; Doc. 38 ¶¶ 200-207.  Specifically, the plaintiffs allege two "laws" impairing their contractual rights: (1) the August 5, 2019 rescission of the commitment resolution (Doc. 38 ¶ 205) and (2) the diversion of the car rental tax proceeds from the Development Authority.  *Id*. ¶ 206.

The plaintiffs effectively concede the City and the Mayor's point that, as a matter of law, the rescission of the commitment resolution was not a legislative act that can give rise to a Contract Clause claim.  Doc. 46 at 27-28; *see Taylor v. City of Gadsden*, 767 F.3d 1124, 1132-33 (11th Cir. 2014) (holding that a municipal resolution to increase pension program contributions was not a "law" under the Contract Clause).  But the plaintiffs maintain that the City Council vote diverting the car rental proceeds "is in fact an ordinance, and hence a 'law' covered by the contract clause."  Doc. 46 at 21.  The plaintiffs are correct.  But, as the plaintiffs conceded at oral argument, the SAC never

alleges a causal connection between the defunding vote and the injuries they allege. Rather, in great detail, the plaintiffs allege that the Mayor's refusal to lift the DNR grant, the City's rescission of the commitment resolution, and the resulting failure of the City to convey Perkins Field to the Development Authority caused their injuries and damages. Doc. 38 ¶¶ 134-139, 155-160.  At oral argument, the plaintiffs invoked what they called "the nail in the coffin theory" to save their Contract Clause claim.  While acknowledging that the harm had been done before the City acted to defund the Development Authority, they argued that if they were somehow able to obtain relief for the harm alleged in the SAC, the defunding decision might "deprive the Development Authority of the resources to go forward."  Maybe, maybe not, but that after-the-fact decision did not cause the harm the plaintiffs allege in the SAC.

Thus, the plaintiffs have not plausibly alleged a Contract Clause claim, (a) because the rescission of the commitment resolution was not a "law" within the scope of the Contract Clause; and (b) they have not alleged a causal connection between the defunding vote and the injuries and damages the plaintiffs claim they suffered. Accordingly, the plaintiffs' Contract Clause claim is **DISMISSED without prejudice**.

## IV. CONCLUSION

For the reasons discussed above, the Development Authority's motion (Doc. 41) is **GRANTED**, and the City and the Mayor's motion (Doc. 42) is **GRANTED in part** and **DENIED in part**.

**SO ORDERED**, this 22nd day of March, 2021.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT