**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **WODA COOPER DEVELOPMENT, INC.,** *et al.*,    ) ) ) | |
| **Plaintiffs,**    ) ) | |
| **v.**    ) ) | **CIVIL ACTION NO. 5:20-CV-159 (MTT)** |
| **CITY OF WARNER ROBINS,**    ) ) ) | |
| **Defendant.**    ) ) | |

<u>**ORDER**</u>

Plaintiffs Woda Cooper Development, Inc. ("Woda Cooper"), Parallel Housing, Inc. ("Parallel Housing"), Perkins Field Limited Partnership ("Perkins LP"), and Parallel Perkins Field Development, LLC ("Parallel Development LLC")—all affordable housing developers—bring this action against Defendant City of Warner Robins, Georgia. Doc. 83. The plaintiffs[1] claim that the City reneged on agreements that would have allowed them to build an affordable housing development in downtown Warner Robins on a site known as Perkins Field. *Id.* That conduct, the plaintiffs contend, violates the Federal Fair Housing Act ("FHA") and Georgia Fair Housing Act ("GFHA").[2] *Id.* The City moves for summary judgment on the plaintiffs' disparate treatment and retaliation claims.[3]

---

[1] "Plaintiffs," as used in this Order, generally refers to all four plaintiffs. However, the parties, particularly plaintiffs' counsel, have been cavalier about the precise role and status of each plaintiff. As a result, some issues involving standing and damages cannot yet be definitively resolved.

[2] The GFHA is analyzed using Federal FHA standards. *See* O.C.G.A. § 8-3-223; *Stewart v. McDonald*, 334 Ga. App. 461, 779 S.E.2d 695 (2015); *Bailey v. Stonecrest Condo. Ass'n, Inc.*, 304 Ga. App. 484, 696 S.E.2d 462 (2010). Unless otherwise noted, references to the FHA include the GFHA.

[3] To the extent the City's motion attacks standing, it is technically a Rule 12(b)(1) motion.

Doc. 100.  The plaintiffs move for summary judgment on their retaliation claim.  Doc. 98.

For the following reasons, the City's motion (Doc. 100) is **GRANTED in part** and

**DENIED in part** and the plaintiffs' motion (Doc. 98) is **DENIED**.

## I. BACKGROUND[4]

### A. The Perkins Field Development

Perkins Field is owned by the City and located next to City Hall in downtown

Warner Robins.  Docs. 100-2 ¶ 26; 134-2 ¶ 26.  The plaintiffs planned to develop an

affordable housing complex in Warner Robins using low-income housing tax credits

("LIHTC").  Docs. 100-2 ¶ 9; 134-2 ¶ 9.  On November 9, 2017, the plaintiffs sent Gary

Lee, the City's economic development director, an email "introducing themselves,

reaching out, and letting the City know that they would like to come to the City of

Warner Robins" to build a development.  Docs. 100-2 ¶ 5; 134-2 ¶ 5.  Approximately 30

or 45 days before the plaintiffs' LIHTC application deadline, the plaintiffs settled on

Perkins Field as the site of the proposed development.  Docs. 100-2 ¶ 28; 134-2 ¶ 28.

### B. City Council Support for the Development in May 2018

On May 7, 2018, the Perkins Field Development (the "Development") concept

plan was presented to City Council during a closed session.  Docs. 100-2 ¶ 44; 134-2 ¶

44.  During this closed session, the Development was characterized as a "*commercial

site with retail businesses on street level*."  Docs. 100-2 ¶ 52; 112 at 208; 134-2 ¶ 52

(emphasis added).  City Council gave Charles Whatley, a consultant advising the City

---

[4] The plaintiffs argue the City "failed to satisfy the basic procedural requirements of Rule 56" by citing to the record, but not the statement of material facts, in its brief.  Doc. 134 at 3-5.  The City counters that the plaintiffs did not file a separate statement of material facts as required by Local Rule 56.  Doc. 144 at 21 n.12.  Although the parties' procedural deficiencies have made the Court's task more difficult, the relevant undisputed facts are discernible.

and the Development Authority of Warner Robins (the "Development Authority"), "authorization to work directly with" the plaintiffs.  Docs. 100-2 ¶¶ 52, 59; 134-2 ¶¶ 52, 59.  The plan was for the City to convey Perkins Field to the Development Authority and the Development Authority would then lease the land to the plaintiffs.[5]  Docs. 100-2 ¶¶ 86, 88; 122 at 107:15-19; 134-2 ¶¶ 86, 88.

Although the City did not vote to transfer the land to the Development Authority during this meeting (nor could it because a municipality cannot convey land during a closed session), the consensus was that the City supported the proposed development.  Docs. 100-2 ¶¶ 47, 66; 134-2 ¶¶ 47, 66; *see also* O.C.G.A. § 50-14-3(b)(1)(E).  For example, Denis Blackburne, a Woda Cooper executive, testified that Gary Lee and Charles Whatley, "gave him a 'thumbs up' and told him that the [C]ity had approved to move forward with the development and a proposed long-term lease structure."  Docs. 100-2 ¶ 47; 134-2 ¶ 47.

## C. The LIHTC Application to the DCA

After receiving the "thumbs up" from City Council, the plaintiffs began preparing their LIHTC application for submission to the Georgia Department of Community Affairs ("DCA"), which included preparing documents demonstrating the plaintiffs had "site control" over the Perkins Field property.  Docs. 100-2 ¶ 73; 122 at 189:7-11; 134-2 ¶ 73.  Simply put, site control means that the applicant has control over the land where the proposed development will be built.  Doc. 109 at 18:19-19:5.

The Qualified Allocation Plan ("QAP") sets the "requirements and incentives for allocating housing credits."  Docs. 109 at 15:17-16:9; 111 at 10:6-12.  As provided in the

---

[5] The Development Authority is "a separate and distinct legal entity from the City."  Docs. 100-2 ¶ 40; 134-2 ¶ 40.

QAP, site control is one of the "threshold" requirements for a LIHTC application.  Docs. 100-2 ¶¶ 16, 73; 134-2 ¶¶ 16, 73.  The QAP states that "site control must be in the form of … [a] warranty deed, … [a] legally binding contract, or … [a] binding long-term ground lease or an option for a binding long-term ground lease."  Doc. 73 at 298. Furthermore, "[f]or competitive applications, contracts must be executed prior to Application Submission deadline, must include a discernible contract price, must be signed by the purchaser and seller, must include a legal description of the property, and must provide legal control of the site to the proposed General Partner or proposed LP." *Id*.  Thus, according to the QAP, for the plaintiffs to have site control over the Perkins Field property, the City—the owner of the property—would need to be a party to any lease agreement between the Development Authority and the plaintiffs.

However, the DCA has "overarching discretion" when evaluating "the applicable threshold categories."  Doc. 111 at 67:23-68:1.  In other words, while the QAP specifies that applicants must have a warranty deed, legally binding contract, or long-term lease agreement to have site control, the DCA can evaluate "a condition precedent to a contract to purchase a proposed project site" and determine whether the applicant still meets the requirements of site control.  *Id*. at 73:6-74:3.

Originally, the plaintiffs intended to enter into an option lease agreement with the City and the Development Authority.  Docs. 73 at 454-60; 100-2 ¶ 88; 134-2 ¶ 88. However, on May 24, 2018—the day the plaintiffs' LIHTC application was due—"Mayor [Randy] Toms could not be found to sign the lease option agreement."  Docs. 100-2 ¶¶ 80, 82; 134-2 ¶¶ 80, 82.  With the application deadline looming, the plaintiffs removed the City from the lease agreement.  Docs. 100-2 ¶ 91; 134-2 ¶ 91.  Therefore, the lease

agreement attached to the plaintiffs' LIHTC application included only the plaintiffs and the Development Authority.  Doc. 109 at 828-835.  The agreement was "subject to" the City conveying Perkins Field to the Development Authority.  *Id*. at 828.  The plaintiffs assumed that the City would eventually pass a resolution transferring the land to the Development Authority and that the project would proceed as planned.  Docs. 100-2 ¶ 95; 104 at 165:8-16; 134-2 ¶ 95.

Even though the plaintiffs did not have site control as defined in the QAP, the plaintiffs were awarded a 9% LIHTC.  Docs. 100-2 ¶ 187; 110 at 90:2-19; 134-2 ¶ 187.  Importantly, the DCA was aware that a future City Council vote was necessary to transfer the land from the City to the Development Authority and stated that this condition precedent "was accurately described in the [plaintiffs' LIHTC] application."  Doc. 111 at 133:4-7, 635.

**D. The Development as a Mainly Residential Facility**

After receiving the LIHTC award, Charles Whatley gave a presentation to City Council, reviewing the Development's affordable housing features and showing a site plan that included Perkins Field.  Doc. 119 at 462.  The presentation, which took place on December 17, 2018, represented that the Development would include "90 residential units" and "approx[imately] 6,000 [square feet] in commercial / retail space."  Docs. 100-2 ¶ 52; 112 at 208; 134-2 ¶ 52.  On March 21, 2019, the plaintiffs gave a presentation to the Development Authority.  Doc. 134-1 ¶ 9.  The March 21, 2019 presentation represented that the Development would have 90 rental units and "4,000+ [square feet] of commercial/retail space (4 to 5 spaces)."  *Id*. at 4, 15, 17.  According to the City, these two presentations departed from the May 7, 2018 representation that the

Development was a "commercial site with retail businesses on street level."  Docs. 100-2 ¶ 52; 112 at 208; 134-2 ¶ 52.

**E. Opposition to the Development in March and April 2019**

On March 26, 2019, local media reported on the Development.  Doc. 104 at 514-16.  The article stated that "two developers from two separate Georgia companies presented a plan to turn Perkins Field into a more than $15 million affordable housing complex"—a plan that was reportedly endorsed by Mayor Toms.  *Id*. at 515.  That same day, David Reid, the creator of the "Enough Is Enough In Warner Robins" Facebook page, posted a poll asking the Facebook page members' opinion on the Development.  Doc. 138-6 at 2.  Ninety-two people commented on the poll.  *Id*. at 3.  The comments included statements such as:

> I and soo [sic] many others want [Perkins] field to be left alone…and besides dont [sic] we have enough crime and low incoming housing already???
> …
> This is just a bad plan. They want to create a "Downtown" experience with retail and lofts, great. Opening up to Section 8 will just create "Projects" in time.
> …
> They know people do not want them building anything on ball fields, etc. Nor put low income in "downtown" when they were supposed to be revitalizing it.
> …
> The problem with affordable housing is it goes to crap within the first year of opening.  It becomes a drug haven.
> …
> The problem I see, is it brings the potential for crime closer to the city.  I say that as someone who had to live in "the projects" when I was younger, in Vidalia GA.  It is a fact that low income attracts crime.
> …
> I am trying very hard not to sound prejudiced, but facts are facts, low income = increased crime.
> …

> The environment can easily be turned to a poorly maintained environment with drug addicts and it could lead to high crime but again it's all based on how the place is ran [sic].

*Id*. at 2-36.

On March 30, 2019, David Reid emailed City Council and Mayor Toms asking them "to provide a statement with each of [their] individual opinions on the plan[.]"  Doc. 121 at 147.  Mayor Toms sent an email to City Council officials on April 1, 2019 stating:

> I would like to share my feelings on the housing project slated to be built on Perkins Field.  I started out opposed to the idea of any multi-family housing on the property, as I did not desire to have our downtown development efforts be centered around housing.  I have truly tried to understand the value in this project and recently, as you may have seen, stated that I would probably vote in favor.
>
> That news report triggered a big citizen reaction, and I have been contacted by many to let me know that they were strongly opposed; in fact, I have never received so many statements of nonsupport and concern over a single issue.  We should expect to see many opponents attend today's meeting.  Therefore, I must follow what I believe to be the desires of my constituency and withdraw my support of this project.  I would certainly be interested in more discussion but strongly urge that any decision be suspended until we can hear from the public and agree on a path forward for the best way, to develop the thriving downtown that so many of our citizens want to see.

*Id*. at 148.  Mayor Toms forwarded this email to David Reid.  *Id*. at 146.

On April 18, 2019, the plaintiffs gave a presentation to City Council to "overcome the [public] resistance" to the Development.  Doc. 121 at 37:20-25.  The presentation described the Development as a residential housing development with 90 rental units and "commercial/retail space (4,000+ [square feet], 4 to 5 spaces)."  Doc. 134-1 at 4, 44-45.  The presentation was livestreamed by the *Houston Home Journal*, a local newspaper.  Doc. 138-5 at 2.  Comments on the livestream included the following:

> Guess the crime rate is not high enough.
> …
> No one feels safe in that area now, unless they are part of the criminals!!!

> …
> Awesome, another drug infested crime area.
> …
> Guess you want what Macon has!  MoreCrime [sic], more problems.
> …
> I can not [sic] believe you want to take Jimmy Perkins field for low income housing.  The boy was killed on that field playing Warner Robins Little League Baseball!  Shame on City council for even considering it!!!
> …
> This will impede the flow of traffic on and off RAFB!

*Id*. at 2-20.

At the same time as these social media posts, Mayor Toms and Councilmember Keith Lauritsen began opposing the Development.  Docs. 115 at 70:18-71:4; 121 at 148. Mayor Toms claims he opposed the Development because (1) it was mostly residential, rather than commercial, (2) Warner Robins citizens wanted to maintain Perkins Field as a park, and (3) general citizen opposition to the Development.  Docs. 120 at 85:16-86:12, 123:23-124:18; 121 at 33:8-20.  Councilmember Lauritsen testified that he opposed the Development because the plaintiffs eliminated the large commercial retail space they promised would accompany the Development.  Doc. 115 at 112:7-16.  There is also evidence that Lauritsen opposed the Development because of the "public outcry."  *Id*. at 194.

## F. Mixed City Council Support for the Development in August 2019

On August 5, 2019, the Development came before City Council for a vote.  *Id*. at 200.  City Council approved "[a] Resolution authorizing Mayor Randy Toms to execute a Lease agreement with the Development Authority of the City of Warner Robins and Woda Cooper Development, Inc. *pending the lifting of the [Department of Natural Resources] grant*" (i.e., the Commitment Resolution).  *Id*. (emphasis added).

Councilmembers Daron Lee, Tim Thomas, Clifford Holmes, and Larry Curtis voted in favor.  *Id*.  Mayor Toms and Councilmember Lauritsen were opposed.  *Id*.

**G. The DNR Grant**

Perkins Field is encumbered by a Department of Natural Resources ("DNR") grant that restricts the land's use for recreational purposes.  Docs. 100-2 ¶¶ 31, 33; 134-2 ¶¶ 31, 33.  The DNR grant cannot be removed from the Perkins Field property until the City completes a "conversion," meaning the grant is transferred to another appropriate parcel of land.  Docs. 100-2 ¶¶ 38, 291-94; 134-2 ¶¶ 38, 291-94.  The conversion process is lengthy, complex, and requires the completion of various "prerequisites," such as finding a replacement property of equal or greater value.  *See* 36 C.F.R. § 59.3; Doc. 118 at 27:7-28:5, 132:10-25.  While the City is responsible for putting together a conversion packet, the decision to approve the conversion rests with the National Park Service.  Docs. 113 at 116:3-11; 118 at 170:15-18.

The plaintiffs were aware that Perkins Field was encumbered by the DNR grant, and that the Development could not proceed until the grant was removed.  Docs. 100-2 ¶ 38; 134-2 ¶ 38.  The City was working on removing the DNR grant for a period of years before the advent of the Perkins Field Development.  Docs. 100-2 ¶ 34; 134-2 ¶ 34.  By December 2019, "there were a number of things that had to be done" to complete the conversion process and it appeared that the City was still at least a year away from removing the DNR grant; however, the plaintiffs contend that the "City had already taken the major steps towards conversion."  Docs. 118 at 188:20-190:4; 134 at 15.

In early 2020, there was a delay in completing the DNR grant conversion.  The City argues that the delay was a result of personnel changes.  Doc. 100-1 at 15-16.  Specifically, the City Attorney, who was taking lead on the conversion process, retired June 20, 2019.  Docs. 100-2 ¶ 382; 100-8 ¶¶ 3, 5; 118 at 160:2-18; 134-2 ¶ 382.  Fred Graham, who was appointed interim City attorney, testified that he was working to get additional items needed to have the conversion approved in January 2020.  Docs. 100-2 ¶ 384; 134-2 ¶ 384.  Graham was then replaced by the new City Attorney in March 2020.  Doc. 100-8 ¶ 4.

The plaintiffs, on the other hand, contend that the delay was intentional.  Doc. 134 at 15.  Because the Commitment Resolution was conditioned on the removal of the DNR grant, the plaintiffs argue that Mayor Toms worked to halt the conversion process.  *Id*. at 15-16.  Although Graham testified that "neither Mayor Toms nor anyone else ever instructed or otherwise directed [him] to stop inquiring into or working on the restriction removal issue on behalf of the City," the plaintiffs present conflicting evidence.  Doc. 100-8 ¶ 8.  Specifically, Greg Bayard, the co-founder of Parallel Housing, testified Graham told him that Mayor Toms instructed Graham not to work on the DNR grant conversion.[6]  Doc. 102 at 61:20-62:12.

## H. City Council Opposition to the Perkins Field Development in Spring 2020

In January 2020, two new City Councilmembers, Charlie Bibb and Kevin Lashley, were elected.  Docs. 103 at 113:11-13; 114 at 159:19-160:4.  They opposed the Development.  Bibb opposed the Development because the project changed from what

---

[6] The City objects to these statements as inadmissible hearsay.  Doc. 144 at 9.  But Mayor Toms and City Attorney Fred Graham were both employees and agents of the City at the time these statements were made.  Docs. 100-8 ¶¶ 3-4; 102 at 62:2-13; 119 at 7:5-7; 120 at 13:16-19, 16:8-11.  As a result, these statements are admissible under Federal Rule of Evidence 801(d)(2).

"was proposed to the economic development board in the beginning and what it ended up being."   Doc. 103 at 128:5-21.  Specifically, his initial understanding was that the Development "was going to provide a lot of commercial and retail space … but ended up not having that at all."  *Id*. at 128:14-17.  Lashley testified that he initially supported the Development because it included commercial retail space but then later opposed the Development when he learned the project was primarily residential.  Doc. 114 at 43:8-16, 146:5-15.

After the November 2019 City Council elections, the Development's opponents finally had enough votes to stop the project.  On March 16, 2020, City Council voted to rescind the Commitment Resolution directing Mayor Toms to sign the lease agreement.  Doc. 114 at 297.  Mayor Toms and Councilmembers Lashley, Lauritsen, and Bibb voted to rescind the Commitment Resolution.  *Id*.  Councilmembers Lee, Holmes, and Curtis opposed.  *Id*.

**I. The Ensuing Litigation and the City's Alleged Retaliation**

On April 23, 2020, the plaintiffs brought claims against the City under the FHA and GFHA based on the City Council vote to rescind the Commitment Resolution.[7]  Doc. 1.  During the ensuing litigation, the plaintiffs contend that the City retaliated against them in response to the exercise of their FHA rights.  Doc. 83 ¶¶ 200-258.  Specifically, on June 28, 2022, defense counsel accused the plaintiffs of perjury during Woda Cooper's Rule 30(b)(6) deposition.  The deposition statements and subsequent

---

[7] The plaintiffs brought disparate treatment and disparate impact claims.  Doc. 1.  The disparate impact claim was dismissed.  Doc. 60.

emails stem from a dispute over the meaning of site control, a predicate for the plaintiffs'

LIHTC application to the DCA.[8]  During the deposition, defense counsel stated:

> Q. Do -- does Woda Cooper know as a company it is a felony to submit
> false documentation to a governmental entity in the state of Georgia?
> A. I did not know that.  Are you threatening to accuse us of a crime?
> Q. I think you have committed a crime, that's my personal opinion, sir, and
> I think these e-mails bear it out that you did it knowingly.
> …
> Q. I'm telling you that in my opinion you-all have committed perjury.

Doc. 73 at 171:2-9, 179:24-25.  Defense counsel reiterated his belief that the plaintiffs

committed illegal acts in a follow up email on July 5, 2022.  Docs. 83-15; 98-2 ¶ 9; 133-1

¶ 9.  The email states:

> After again conferring with the City Council of the City of Warner Robins,
> while also bringing to their attention the events that transpired during last
> week's 30(b)(6) deposition, and inasmuch as the City has learned that the
> DNR Restriction may not be moved or transferred [to] the new North
> Houston recreational facility, the City is not interested in exploring further
> settlement negotiations.  Please take notice of this fact.
>
> After the conclusion of our taking DCA's depositions where we will be
> sharing or disclosing certain emails and pertinent redlined documents,
> contracts, and letters, we intend to submit all this information, along with
> deposition transcripts and pleadings from this case, to the Attorney
> General's Office and to the Fulton County District Attorney's Office for
> their review.
>
> Further, based upon documents and admissions made in this pending
> litigation, we intend to demand that DCA withdraw the 9% LIHTC award
> made to Woda Cooper in November of 2018.  If DCA refuses, we intend to
> file a mandamus action against the State of Georgia/DCA to force the
> termination or withdrawal of said 9% award due to intentional
> misrepresentations/fraud and due to Woda Cooper's complete failure to
> satisfy the threshold site control requirement as specified in the 2018
> QAP.

---

[8] The City contends that because the City was not a party to the lease agreement submitted with the
plaintiffs' LIHTC application, the plaintiffs did not have site control as defined in the QAP and actively
mispresented this fact to the DCA.  Doc. 100-1 at 12-14, 41-43.  The plaintiffs argue that there was no
misrepresentation: (1) the DCA had discretion to vary from the QAP and (2) the DCA was always aware
that the City needed to convey the Perkins Field property to the Development Authority for the
Development to proceed.  Doc. 134 at 8-9.

Doc. 83-15 at 2.  In sum, the email outlines a plan to initiate criminal proceedings and seek revocation of the LIHTC award—coupled with terminating further settlement negotiations.  *Id*.  In another follow-up email on August 11, 2022, defense counsel stated that the plaintiffs "perpetrated a fraud on the" DCA and that he planned to "expose and report the same."  Docs. 76-7 at 1; 98-2 ¶ 12; 133-1 ¶ 12.

On August 30, 2022, all four plaintiffs moved to amend their complaint to allege a retaliation claim.  Doc. 71.  The Court granted in part and denied in part the plaintiffs' motion to amend, allowing the plaintiffs to allege FHA and GFHA retaliation claims based on the deposition threats and emails.  Doc. 82.

**J. Motions Before the Court**

The City moves for summary judgment on the plaintiffs' disparate treatment claim.  Doc. 100.  The plaintiffs rely on the alleged racially motivated social media comments as evidence that the City acted to ratify the racial biases of the community when it rescinded the Commitment Resolution.  Doc. 134 at 10-13.  The City counters that the statements are not racial in nature and that there is no evidence the Councilmembers or Mayor were aware of the statements.  Doc. 100-1 at 26-31.  As a result, the City contends that the plaintiffs have failed to create a triable issue of fact as to whether the City intentionally discriminated on the basis of race when it rescinded the Commitment Resolution.  *Id*.

Both parties move for summary judgment on the retaliation claim.  Docs. 98; 100. The plaintiffs argue that defense counsel's statements during Woda Cooper's Rule 30(b)(6) deposition and the follow-up emails were made in retaliation for the plaintiffs'

exercise of their FHA rights.  Doc. 98-1 at 2-3.  The City contends these statements

were nonretaliatory and part of a legitimate defense strategy.  Doc. 133 at 12.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on

the evidence presented, "a reasonable jury could return a verdict for the nonmoving

party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir.

2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th

Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The burden

rests with the moving party to prove that no genuine issue of material fact exists.  *Info.*

*Sys. & Networks Corp.*, 281 F.3d at 1224.  The party may support its assertion that a

fact is undisputed by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

"If the moving party bears the burden of proof at trial, the moving party must

establish all essential elements of the claim or defense in order to obtain summary

judgment."  *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing

*Four Parcels of Real Prop.*, 941 F.2d at 1438).  The moving party must carry its burden

by presenting "credible evidence" affirmatively showing that, "on all the essential

elements of its case on which it bears the burden of proof at trial, no reasonable jury

could find for the nonmoving party."  *Four Parcels of Real Prop.*, 941 F.2d at 1438.  In

other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict.  *Id*.

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id*. (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.*  Thus, the Court "can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists."  *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)).  The moving party "simply may show ...  that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (cleaned up).  "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Cartrett.*, 477 U.S. at 324).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion.  *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).  "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted).  The Court will consider each motion on its own merits, and will view the facts "in the light most favorable to the non-moving party on each motion."  *Am. Bankers Ins. Grp.*, 408 F.3d at 1331; *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012).

### III. DISCUSSION

**A. Standing**

The City argues all four plaintiffs lack standing because they have asserted injuries that are "purely economic" and are not "affected by any racial interest"—meaning the plaintiffs have not established that the Development would have mainly minority tenants.  Doc. 100-1 at 19-22.  Furthermore, the City argues three of the plaintiffs, Woda Cooper, Parallel Housing, and Parallel Development LLC, lack standing because these entities have not demonstrated an individualized, direct injury.  *Id*.

The Court must resolve standing[9] before deciding the merits.  *AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1359 (11th Cir. 2007) (citations omitted).  To establish Article III standing, "a plaintiff must demonstrate (1) an

---

[9] In addressing standing, the parties do not distinguish between the FHA and GFHA.  To the extent the parties argue Article III standing that could be significant.  But the parties agree that the applicable standing principles apply to both the FHA and GFHA.  The Court abides by their assumption.  Nor do the parties, when addressing standing, distinguish between the disparate treatment and retaliation claims.

injury-in-fact; (2) a causal connection between the asserted injury-in-fact and the defendant's actions; and (3) that 'the injury will be redressed by a favorable decision.'" *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1229 (11th Cir. 2021) (quoting *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001)).  Additionally, a plaintiff must also satisfy "'statutory' standing requirements."  *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 196 (2017).  The FHA "allows any 'aggrieved person' to file a civil action seeking damages for a violation of the statute."   *Id.* at 193 (citing §§ 3613(a)(1)(A), 3613(c)(1)). "And [the FHA] defines an 'aggrieved person' to include 'any person who ... claims to have been injured by a discriminatory housing practice.'"  *Id.* (citing § 3602(i)).  The Supreme Court "has repeatedly written that the FHA's definition of person 'aggrieved' reflects a congressional intent to confer standing broadly."[10]  *Id.* at 197.

Attacks on standing, like other jurisdictional attacks, come in two forms.  "'Facial attacks' on the complaint require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion."  *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (cleaned up).  Factual attacks, however, "challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."  *Id.*

---

[10] Typically, if a plaintiff satisfies constitutional standing requirements, the plaintiff satisfies FHA standing requirements.  *See Bank of Am. Corp*, 581 U.S. at 196-200.  Specifically, in *Bank of America*, the Supreme Court noted that "the definition of 'person aggrieved' in the original version of the FHA … 'showed a congressional intention to define standing as broadly as is permitted by Article III of the Constitution."  *Id.* at 197 (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972)).  And "when Congress amended the FHA, it retained without significant change the definition of 'person aggrieved.'"  *Id.* at 199 (citing *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)), for the proposition that "Congress normally adopts our interpretations of statutes when it reenacts those statute without change").

Here, the City, citing to matters outside the pleadings, launches a factual attack on all four plaintiffs' standing.  Plaintiffs Perkins LP and Woda Cooper, at least with regard to the disparate treatment claim, have provided evidence of an injury in fact that could be redressed by a favorable decision sufficient to establish standing.  However, Plaintiffs Parallel Housing and Parallel Development LLC allege a derivative injury insufficient to establish standing.

### 1. Organizational Structure and Alleged Injuries

The plaintiffs are four entities that were allegedly involved in the planning and creation of the Perkins Field Development.  Plaintiff Perkins LP was, or would be, the owner of the Development and claims approximately $500,000 in lost profits.  Docs. 100-2 ¶ 42; 123 at 301; 134 at 8; 134-2 ¶ 42.  Perkins LP hired two developers to bring the project to fruition—Plaintiff Parallel Development LLC and Plaintiff Woda Cooper. Docs. 100-2 ¶ 417; 134-2 ¶ 417.[11]  Parallel Development LLC is a member of Perkins LP.  Doc. 102 at 124.  And Plaintiff Parallel Housing is a member of Parallel Development LLC, and thus, Perkins LP.  *Id.*

Parallel Development LLC and Woda Cooper claim approximately $1,800,000 in lost "developer fees."  Docs. 134 at 18; *see also* Doc. 123 at 98-102, 300-301, 305-313. In addition to lost developer fees, Woda Cooper advanced approximately $800,000 in preliminary costs, including engineering and design consultations, inspection and permit fees, and environmental reports.  Doc. 123 at 98:5-22, 300-08.  According to plaintiffs,

---

[11] The plaintiffs, throughout the record, refer to Parallel Perkins Field *Development* LLC and Parallel Perkins Field *Developer* LLC.  *See* Docs. 134 at 18; 134-2 ¶ 417.  In a June 8, 2023 status conference, plaintiffs' counsel clarified that Plaintiff Parallel Perkins Field Development LLC is Parallel Perkins Field Developer LLC.

only Woda Cooper incurred out of pocket damages.[12]  Woda Cooper is not in the ownership structure of Perkins LP.  Docs. 102 at 124; 104 at 27:25-28:1.

### 2. Perkins LP and Woda Cooper

Perkins LP and Woda Cooper have both demonstrated a direct, economic injury affected by racial interests.  Perkins LP, the anticipated owner of the Development, has demonstrated an injury in fact—lost profits resulting from the City's decision not to move forward with the Development.  Docs. 123 at 24:10-13, 25:14-16, 301; 134 at 18.  Similarly, Woda Cooper, one of the hired developers, has demonstrated an injury in fact—approximately $800,000 in advanced preliminary costs.  Doc. 123 at 98:5-22, 300-08; *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977) (identifying the expenditure of "thousands of dollars on the plans for [a development] and on the studies submitted to the Village in support of the petition for rezoning" as valid economic injuries supporting standing).  These preliminary costs are direct injuries incurred by Woda Cooper.  Docs. 102 at 124; 104 at 27:25-28:1.

However, the City argues that these economic injuries are not injuries "affected by racial interests," and thus, Perkins LP and Woda Cooper do not have standing under the FHA.  Doc. 100-1 at 21 (citing *River Cross Land Co., LLC v. Seminole Cnty.*, 2021 WL 2291344, at *19 (M.D. Fla. June 4, 2021); *Nasser v. City of Homewood*, 671 F.2d 432, 437 (11th Cir. 1982)).  "[A] developer or property owner will not have standing to sue under the FHA if the developer alleges a purely economic injury without any specific plans to build a development that will demonstrably house minority tenants."  *River Cross Land*, 2021 WL 2291344, at *19 (citing *Nasser*, 671 F.2d at 435-38).  In *Nasser*,

---

[12] At the June 8, 2023 status conference, plaintiffs stated Parallel Housing also incurred out of pocket expenses.  The record, established by the plaintiffs, does not support that.  Doc. 123 at 98:5-22.

the plaintiffs submitted an affidavit that the proposed housing development would house "low and moderate-income" individuals.  671 F.2d at 435.  However, the plaintiffs in *Nasser* did not provide any evidence of the racial makeup of the proposed housing development.  *Id*.  Because "low and moderate-income housing" is not "synonymous with housing for minorities," the Eleventh Circuit concluded that the plaintiffs' allegations of a purely economic injury "not somehow affected by racial interests" was insufficient to establish standing under the FHA.  *Id*. at 435, 437.  Similarly, in *River Cross Land*, the plaintiff did not submit "any information about the demographics of the individuals who would be expected to move into" the housing development.  2021 WL 2291344, at *19.  As a result, the court held that the plaintiff did not have standing under the FHA.  *Id*. at *20.

By contrast, Perkins LP and Woda Cooper have supplied evidence that the Development would have minority tenants.  Docs. 130 at 7-8; 130-2 at 16, 24; 130-3 at 19.  This is sufficient to establish Perkins LP and Woda Cooper have incurred an economic injury affected by racial interests and have standing under the FHA.  *See Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1409 (11th Cir. 1989) ("This case is unlike [*Nasser*], in which plaintiffs alleged only an economic injury unaffected by any racial interest.  Here, [the plaintiff] alleges its injury results from racial animus.").[13]

---

[13] The City also argues that because the Development is no longer "viable" the plaintiffs cannot obtain equitable relief, and thus, lack standing to assert their claims.  Doc. 100-1 at 21-22.  As the Supreme Court noted in *Village of Arlington Heights* "all housing developments are subject to some extent to … uncertainties," such as the need to "secure financing, qualify for federal subsidies, and carry through with construction."  429 U.S. at 261.  The presence of such uncertainties does not preclude a finding of standing.  *Id*.  Rather when a plaintiff has outlined a "detailed and specific" project, like the Perkins Field Development, the court is "not required to engage[] in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy" to show an injury that is likely to be redressed by a favorable decision.  *Id*.  Thus, the City's argument is meritless.

### 3. Parallel Housing and Parallel Development LLC

Parallel Housing and Parallel Development LLC are members of Perkins LP. Doc. 102 at 124.  Parallel Development LLC claims approximately $1,800,000 in lost "developer fees"; however, it is undisputed that the developer fees "would have first flowed through" Perkins LP.  Docs. 100-2 ¶ 421; 134 at 18; 134-2 ¶ 421.  Additionally, while the plaintiffs claim that Parallel Housing "would suffer real damages from the failure to complete an affordable housing development," the plaintiffs do not identify a specific injury incurred by Parallel Housing.  Doc. 134 at 18.  As a result, the City contends that Parallel Housing and Parallel Development LLC are essentially bringing a claim on behalf of Perkins LP, and thus, lack standing.  Doc. 100-1 at 20-21.

Generally, an individual's status as a corporate shareholder or a member of an LLC will not give the individual standing to prosecute a claim on behalf of a corporation or LLC.  *Phoenix Airline Servs., Inc. v. Metro Airlines, Inc.*, 260 Ga. 584, 585, 397 S.E.2d 699, 701 (1990); *Sw. Health & Wellness, L.L.C. v. Work*, 282 Ga. App. 619, 624, 639 S.E.2d 570, 576 (2006).  Similarly, partners in a limited partnership cannot sue directly when the partnership suffers injury.  *See Hendry v. Wells*, 286 Ga. App. 774, 650 S.E.2d 338 (2007).  As far as injury and damages are concerned, Parallel Housing and Parallel Development LLC are plaintiffs in this lawsuit merely because they are members of Perkins LP.  Doc. 102 at 124.  That is not to say that Parallel Housing and Parallel Development LLC would not have a role in the Development.  Owners of an entity often are key players and Perkins LP would only act through its agents.  The point though is that the alleged injury, resulting from the City's conduct, was suffered by Perkins LP, not by its members or owners.

In sum, Parallel Housing and Parallel Development LLC have not demonstrated a direct, individualized injury sufficient to establish standing.  However, Perkins LP and Woda Cooper have provided evidence of an injury that can be redressed by a favorable decision sufficient to establish standing.  Accordingly, the Court has jurisdiction over this case and can address the merits.[14]

## B. Proof in FHA and GFHA Disparate Treatment and Retaliation Claims

In FHA cases, courts apply the methods of analysis developed for use in cases under Title VII.  *Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc.*, 3 F.3d 1472, 1476 n.6 (11th Cir. 1993); *Steed v. EverHome Mortg. Co.*, 308 F. App'x 364, 368 (11th Cir. 2009); *Boykin v. Bank of Am. Corp.*, 162 F. App'x 837, 838 (11th Cir. 2005).  Under this approach, a plaintiff may present either direct or circumstantial evidence of discriminatory intent.  "Direct evidence … is evidence that, if believed, proves the existence of a fact without inference or presumption."  *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 854 (11th Cir. 2010) (internal quotation marks and citation omitted).  In the absence of direct evidence, a plaintiff can rely on either the *McDonnell Douglas* burden-shifting framework or present a convincing mosaic of circumstantial evidence sufficient to create a triable issue of fact as to whether the defendant acted with discriminatory intent.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  This is true for retaliation claims as well.  *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir.

---

[14] As noted, the parties do not separately address which plaintiffs have standing to assert retaliation claims.  The Court concludes that the City's motion does not address that issue.  But it has to be resolved.

1997) (Title VII retaliation); *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001) (FHA retaliation); *Newell v. Heritage Senior Living, LLC*, 673 F. App'x 227, 231 (3d Cir. 2016) (FHA retaliation).

## C. Disparate Treatment Claim

"The FHA prohibits the 'refus[al] to sell or rent ... or otherwise make unavailable or deny, a dwelling to any person because of race.'" *Hallmark Devs., Inc. v. Fulton Cnty., Ga.*, 466 F.3d 1276, 1283 (11th Cir. 2006) (quoting 42 U.S.C. § 3604(a)). "In order to prevail on a claim under the FHA, a plaintiff must demonstrate 'unequal treatment on the basis of race that affects the availability of housing.'" *Id.* (quoting *Jackson v. Okaloosa Cnty., Fla.*, 21 F.3d 1531, 1542 (11th Cir. 1994)). At its core, the plaintiffs' theory of disparate treatment is as follows: The City enthusiastically supported the Development until the community raised race-based objections; then the City worked to block the Development, ratifying the discriminatory motives of the community.[15]  Doc. 134 at 10-15.

To prove that the City's decision to rescind the Commitment Resolution "was based on intentional discrimination, [the] plaintiff[s] must 'establish that race played some role' in the decision." *Hallmark*, 466 F.3d at 1283 (quoting *Sofarelli v. Pinellas Cnty.*, 931 F.2d 718, 722 (11th Cir. 1991)). Neither the Court nor the parties have found authority articulating the elements of a prima facie case when a developer contends that

---

[15] The plaintiffs list other actions by City officials that "torpedo[ed] the development," including "directing Fred Graham, the City attorney, to stop work on the DNR Grant transfer; defunding the [Development Authority] so it could not assist with the Development; trying to shift the Development onto property in the 100 year flood plain; violating City Ordinances on procedure to rescind the Commitment Resolution; and stopping all work on the DNR Grant transfer after January 2020." Doc. 134 at 15-16. These allegations confirm that some city officials changed their mind. The question though is whether the City was racially motivated.

local governmental decisions violated the FHA.  Rather, the Eleventh Circuit has identified four factors "that are instructive in determining whether racially discriminatory intent is present," an approach similar to the mosaic circumstantial theory used in Title VII cases.  *Id*.  These factors include: (1) discriminatory or segregative effect, (2) historical background, (3) the sequence of events leading up to the challenged actions, and (4) whether there were any departures from normal or substantive criteria.  *Id*.  Relying on the four *Hallmark* factors,[16] the plaintiffs argue they have presented sufficient circumstantial evidence sufficient to create a triable issue concerning the City's discriminatory intent.[17]  Doc. 134 at 21-28.  Because the *Hallmark* analytical framework is dispositive, the Court begins with a discussion of *Hallmark*.

*1. Summary of Hallmark*

The plaintiffs in *Hallmark* bought property with the intention of building low-income housing.  466 F.3d at 1279.  The property needed to be rezoned by the Board of Commissioners (the "Board") for the development to take place.  *Id*.  Commissioner Edwards, the city official taking the lead on the rezoning application, told Hallmark to consult with community associations and "get the community happy" to successfully rezone the property.  *Id*. at 1279-80.

---

[16] The plaintiffs also cite to the factors outlined in the Supreme Court decision *Village of Arlington Heights*.  Doc. 134 at 22.  These factors are essentially the same as the factors identified in *Hallmark* and are addressed in the Court's discussion.

[17] Although the parties, and the Court, agree that *Hallmark* provides the framework for analyzing the plaintiffs' circumstantial evidence case, the parties also discuss legitimate nondiscriminatory reasons and pretext, which of course are elements of the *McDonnell Douglas* framework.  Docs. 100-1 at 31; 134 at 28-31.  While the facts the parties raise are relevant to the Court's *Hallmark* analysis, and the Court addresses those facts, "legitimate nondiscriminatory reasons" and "pretext" are not *Hallmark* factors or part of the convincing mosaic theory.

Hallmark then met with various community groups suggested by Commissioner Edwards. *Id*. at 1281. During one of these community meetings, "Hallmark's counsel heard Commissioner Edwards say to [a community leader], 'I know a lot of your objections to projects like [Hallmark's] proposed development, *is a black issue*.'" *Id*. (emphasis added). However, no one expressed overt racial opposition to the rezoning at any hearing before the Board. But community members did express opposition to the development because it was not "upscale," would house "transient" individuals, and was priced too low. *Id*. Despite community opposition, "[t]he County's Planning Staff, Community Zoning Board, the Atlanta Regional Commission, and the Georgia Regional Transportation Authority reviewed and repeatedly recommended approval for Hallmark's zoning application." *Id*.

When the vote came, Commissioner Edwards voted to deny rezoning because of community opposition, and his fellow commissioners followed suit. *Id*. at 1282. The plaintiffs sued the County alleging disparate treatment under the FHA. *Id*. Specifically, the plaintiffs argued that (1) "in giving effect to the racist views of the community groups, the County acted with intent to discriminate" and (2) that the *Hallmark* factors "produced sufficient circumstantial evidence of discriminatory intent." *Id*. at 1282, 1285.

The Eleventh Circuit concluded that the plaintiffs' evidence was insufficient to raise a triable issue of fact of discriminatory intent. *Id*. at 1284. Even though Commissioner Edwards characterized opposition to the development as a "black issue" and he typically voted consistent with the desires of the community groups, the plaintiffs' evidence was insufficient to demonstrate that the Board acted to ratify the racial motives of the community members. *Id*. Specifically, the court noted:

> [The] statement [did] not demonstrate that (1) the other members of the Board were aware of the racist attitudes of the community leaders; (2) that Commissioner Edwards was aware that any other community leaders had racist motivations; or (3) that despite the racist motivations of certain community leaders, the Board was not justified in denying the re-zoning based on the quality of the proposed development.

*Id*. Additionally, the court held that the "subtle statements of bias" made in front of the Board at hearings on the proposed rezoning demonstrated class, not racial, animus. *Id*. at 1284-85 ("Wealth is not a proxy for race.").   Thus, the plaintiffs failed to establish that the Board ratified the racial motivations of private citizens. *Id*. at 1285.

 2. *The City did not ratify the racial biases of the community*.

 Like the developers in *Hallmark*, the plaintiffs argue that the City voted to rescind the Commitment Resolution because of the racial bias of the Warner Robins community.  Doc. 134 at 10-13, 24-25.  But the plaintiffs cannot demonstrate (1) that community opposition to the Development was based on racial animus; (2) that the Mayor and City Council were aware of any allegedly racist attitudes of the community; or (3) that the City was not justified in rescinding the Commitment Resolution because of the reduction in commercial retail space.

 First, the plaintiffs have no evidence "that racial considerations were a motivating factor behind" community opposition to the Development.  *Hallmark*, 466 F.3d at 1284 (internal quotation marks and citation omitted).  The plaintiffs point to the "racially charged and racially stereotypical" social media comments as evidence that community opposition to the Development was steeped in racial animus.  Doc. 134 at 11-12.  Those comments claimed the Development would bring increased crime and drug use to Warner Robins.  Docs. 138-5; 138-6.  Relying on non-binding decisions from other

circuits,[18] the plaintiffs argue these comments are code words for race.  Doc. 134 at 12-13.  But Eleventh Circuit precedent does not support this interpretation.  The court in *Hallmark* held that "subtle statements of bias"—not "upscale," would house "transient" individuals, and priced too low—were not evidence of racial animus.  466 F.3d at 1284-85.  Similarly, though the social media comments equate affordable housing to crime and drug use, these "ambiguous comments" are not code words for race.  *Id*. (citing *Macone v. Town of Wakefield*, 277 F.3d 1, 7 (1st Cir. 2002); *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 743-44 (1st Cir. 1995); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1292 (7th Cir. 1977)).  Rather, these statements demonstrate class bias—and "wealth is not a proxy for race."[19]  *Id.*

Second, even if the social media comments could be taken as evidence of racial animus, the plaintiffs have no evidence that the Mayor or City Councilmembers were aware of the statements.  To demonstrate that the City acted to ratify the racial motives of the community, the plaintiffs must demonstrate that Mayor Toms and Councilmembers Lashley, Lauritsen, and Bibb—the Councilmembers who voted to

---

[18] They also are distinguishable.  Doc. 134 at 12-13 (citing *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004); *Smith v. Town of Clarkton, N. C.*, 682 F.2d 1055 (4th Cir. 1982); *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F. Supp. 2d 563 (E.D. La. 2009); *City of Memphis v. Greene*, 451 U.S. 100 (1981); *Atkins v. Robinson*, 545 F. Supp. 852, 872 (E.D. Va. 1982); *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493 (9th Cir. 2016)).  *McGinest* and *Smith* involved the use of racial slurs in addition to ambiguous remarks.  *McGinest*, 360 F.3d at 1115; *Smith*, 682 F.2d at 1062.  *Greater New Orleans Fair Housing Action Center* involved an existing development with a high percentage of African American residents.  641 F. Supp. 2d at 572.  The Supreme Court concluded in *Greene* that despite the presence of ambiguous statements there was no racially discriminatory motive on the part of the defendant.  451 U.S. at 126.  Finally, in *Atkins* and *Avenue* the statements were made by the decision makers, by citizens at public hearings, or in correspondence with the decision makers, not on social media platforms with no connection to the City Councilmembers or Mayor.  *Atkins*, 545 F. Supp. at 871; *Avenue*, 818 F.3d at 499-501.

[19] The Court does not condone the statements made in the social media posts—equating poverty to crime and drug use is an unfair trope.  But the question is whether such comments evidence racial animus.  And it would be equally unfair to assume that concerns about crime and drug use, which affect individuals of all races, are code words evidencing racial bias.  Indeed, given the widespread absence of filters between thought and keyboard, it can be argued that the social media posts here were relatively mild.

rescind the Commitment Resolution—were aware of the allegedly discriminatory social media posts.

The plaintiffs argue the Councilmembers and Mayor were aware of the social media comments because (1) the Councilmembers and Mayor testified that they were aware the *Houston Home Journal* and Enough is Enough pages existed and (2) Charles Whatley, a consultant working for the City on the Development project, testified that city officials read the pages regularly.  Doc. 134 at 10 n.1, 13-15.  This is insufficient to raise a genuine dispute of material fact.

Whatley testified that "the council members, the mayor, a lot of elected officials" read "the Facebook page … regularly."  Docs. 122 at 240:22-241:18; 134-2 ¶ 164. Whatley then clarified that "Tim Thomas, Daron Lee, Larry Curtis and a few others" were the individuals who "told [him] that they regularly read" the "Facebook page." Docs. 122 at 241:13-15.  Moreover, Whatley could not remember the name of the "Facebook page" and *none* of the individuals Whatley identified voted to rescind the Commitment Resolution.  Doc. 114 at 297.

Furthermore, while the plaintiffs point to evidence that the Mayor and Councilmembers were aware of public opposition to the Development, there is no evidence that they were aware of the public opposition expressed in these social media comments.  *See* Doc. 134 at 10 n.1, 13-15.  In fact, the Mayor and Councilmembers all testified that they had not seen the allegedly discriminatory social media posts.  Docs. 103 at 61:23-25, 95:8-16, 101:2-13 (Bibb); 114 at 59:13-16, 96:14-18, 106:11-18, 115:8-14 (Lashley); 115 at 59:13-17, 63:22-64:2, 66:2-10 (Lauritsen); 120 at 66:3-4, 130:16-20, 133:15-21 (Toms); 121 at 12:23-24 (Toms continued).  Without evidence that the

Councilmembers or Mayor were aware of the social media posts, the plaintiffs cannot demonstrate that the City acted to ratify the motives behind those posts.[20]

Third, the plaintiffs cannot "demonstrate that … despite the racist motivations of certain community leaders, [the City] was not justified" in rescinding the Commitment Resolution based on the reduction in commercial retail space.  *Hallmark*, 466 F.3d at 1284.  Mayor Toms and Councilmembers Bibb, Lashley, and Lauritsen all testified that they initially supported the Development because it included significant commercial retail space.  However, when they learned that the Development would focus on residential housing and would not include the large commercial retail space they envisioned, they had second thoughts.  Docs. 103 at 128:5-21 (Bibb); 114 at 145:15-20 (Lashley); 115 at 112:7-16 (Lauritsen); 120 at 85:16-86:12, 123:23-124:18 (Toms); 121 at 33:8-20 (Toms continued).  The plaintiffs counter that this is not credible because the Development "had only been presented as a LIHTC financed affordable housing development."  Doc. 134 at 13-15.  But the Development was not "only" presented as an affordable housing development.  At first, the plaintiffs presented the Development as "a commercial site with retail businesses on street level."  Docs. 100-2 ¶ 52; 112 at 208; 134-2 ¶ 52.  Later presentations departed from this representation and reduced the commercial retail space in the Development.  Docs. 119 at 476; 134-1 at 4, 15, 17.

---

[20] The plaintiffs make much of Mayor Toms' emails with David Reid, the creator of the Enough is Enough Facebook page.  Doc. 134 at 10-13.  But those emails are not evidence that Mayor Toms was aware of the Facebook posts—they make no mention of the Enough is Enough Facebook page.  And even if Mayor Toms was aware of the social media comments on the Enough is Enough Facebook page, the plaintiffs have no evidence that the *other* Councilmembers were aware of the social media posts. *Hallmark*, 466 F.3d at 1284 (holding that overtly racist statement made to one Commissioner did "not demonstrate that … the other members of the Board were aware of the racist attitudes of the community leaders"); *see also Mason v. Vill. of El Portal*, 240 F.3d 1337, 1339 (11th Cir. 2001) ("Thus the critical issue on appeal is whether the alleged racially discriminatory motive of only one member of a three-member majority of a five-member council can give rise to municipal liability.  We agree with the trial court that it does not.").

Thus, like the developers in *Hallmark*, the plaintiffs have not shown that the Councilmembers and Mayor were not justified in opposing the Development for this reason.  466 F.3d at 1284.

The plaintiffs have no evidence that community opposition to the Development was based on racial animus, that the Mayor and Councilmembers were aware of any allegedly racist attitudes of the community, or that the City was not justified in rescinding the Commitment Resolution because of the reduction in commercial retail space.  As a result, the plaintiffs have not raised an issue of triable fact suggesting that the City acted to ratify the alleged racial motives of the community when it voted to rescind the Commitment Resolution.

### 3. The four *Hallmark* factors do not provide circumstantial evidence of discriminatory intent.

After analyzing whether the Board ratified the discriminatory motives of the community, the Eleventh Circuit in *Hallmark* examined whether the (1) discriminatory or segregative effect, (2) historical background, (3) sequence of events, and (4) departure from normal procedures provided circumstantial evidence of discriminatory intent.  466 F.3d at 1285.  The court assumed that Hallmark's expert, who testified that the rezoning decision had a disparate impact on minorities, was sufficient to establish a discriminatory effect.  *Id*.  However, because "there [was] no evidence that the Board in fact ratified the discriminatory motives of any community group," the court held that the remaining factors did not raise a genuine issue of material fact as to whether the Board acted with discriminatory intent.  *Id*.  Rather, the Board justified its denial of the rezoning petition because the development "was unpopular with voters and poorly designed."  *Id*.

at 1288-86.  Because "no racial animus [was] expressed to the Board," the court noted

that "bowing to political pressure [did] not demonstrate racial animus."  *Id*. at 1285.

Here, the plaintiffs also contend that the *Hallmark* factors provide circumstantial

evidence of discriminatory intent.  Doc. 134 at 22-28.  But even assuming the plaintiffs

have evidence of discriminatory impact, the other three *Hallmark* factors do not support

an inference of discriminatory intent.

With regard to the "historical background" of the decision to rescind the

Commitment Resolution, the plaintiffs do not cite any prior instance where the City has

impeded the development of low-income housing.[21]  Rather, the City presents evidence

that "[j]ust since 2017, there have been eight affordable housing developments

completed in the City of Warner Robins."  Doc. 144 at 16 (citing Doc. 109 at 836).

Thus, there is evidence that the City has aided and encouraged the development of

other low-income housing projects, such as the Pennrose Developments.  Docs. 100-2

¶ 177; 139-1 ¶¶ 11-12, 23, 25-26; 134-2 ¶ 177.  This factor does not provide

circumstantial evidence of discriminatory intent.

Next, turning to the "sequence of events" factor, the plaintiffs argue that because

"[t]he City was solidly behind the Development until the Enough Is Enough group raised

---

[21] The plaintiffs argue that the historical background analysis should "focus[] on the change in the City's position, from one of enthusiastic support based on long-standing plans, to irregular and deceptive opposition, once racially motivated community opposition sprang up in March and April 2019."  Doc. 134 at 24.  This evidence is more appropriately analyzed under the sequence of events factor.  The "historical background" factor focuses on how similar proposals were treated previously by city officials.  *See Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1368 (S.D. Fla. 2012) (analyzing City's ten-year history of "trying to restrict the ability of individuals with disabilities from residing in single family areas at rehabilitation facilities"); *Palm Partners, LLC v. City of Oakland Park*, 102 F. Supp. 3d 1334, 1345 (S.D. Fla. 2015) (The plaintiffs do "not cite any other instance where the City has made a zoning decision adversely affecting people with disabilities."); *Jim Sowell Const. Co. v. City of Coppell*, 61 F. Supp. 2d 542, 547 (N.D. Tex. 1999) ("Evidence relevant to this factor is the City's response to prior similar proposals, or whether the City has historically discriminated against the protected group.").

racially coded opposition" that "the sequence of events preceding the challenged actions is suspicious."  Doc. 134 at 24.  That argument is a rehash of the plaintiffs' ratification argument.  In any event, the "sequence of events is only relevant if it demonstrates that the [City] ratified the racial biases of" the community.  *Hallmark*, 466 F.3d at 1285.  As discussed, there is no evidence that community opposition was based on racial animus or that the City acted to ratify the racial biases of the community.  Thus, this factor does not provide circumstantial evidence of discriminatory intent.

Finally, the plaintiffs point to the more favorable treatment of the Pennrose Developments as evidence that the City departed from its normal procedures when it voted to rescind the Commitment Resolution.  Doc. 134 at 25-28.  But "[s]uch 'procedural abnormalities are only relevant within a larger scope.'"  *Hallmark*, 466 F.3d at 1285 (quoting *Macone*, 277 F.3d at 6).  And the plaintiffs would have the Court "ignore a whole host of events which occurred between" the City's approval of the Pennrose Developments and the City's vote to rescind the Commitment Resolution.  *Macone*, 277 F.3d at 6.  Most notably, in January 2020, two City Councilmembers who supported the Development were replaced by City Councilmembers who opposed the Development.  Thus, the City Council that entered into a lease agreement with Pennrose Developments in May 2017 was not the same City Council that voted to rescind the Commitment Resolution in March 2020.  Docs. 100-2 ¶ 183; 134-2 ¶ 183.[22]

---

[22] The plaintiffs dispute ¶ 183, stating that "[t]he City cannot produce admissible evidence to support the stated material fact."  Doc. 134-2 ¶ 183.  But the City produced the lease agreement and the affidavit of Amon Martin, the Regional Vice President of Southeast Pennrose, testifying that Pennrose, the City, and the Development Authority entered into a long-term lease on May 25, 2017.  Docs. 139-1 ¶¶ 1, 4, 17; 139-4.  Accordingly, there is admissible evidence that the City entered into a lease agreement with Pennrose Developments in May 2017.

Further, the Perkins Field Development was conditioned upon the removal of the DNR grant.  While the City was responsible for putting together a conversion packet, whether to approve or deny the conversion is left to the discretion of the National Park Service.  Docs. 113 at 116:3-11; 118 at 170:15-18.  The plaintiffs contend that unlike the Pennrose Developments where the City worked to remove a similar Department of Defense land use restriction, the City purposely stopped working on the DNR grant conversion process in the fall of 2019 or early 2020.  Docs. 134 at 26-28; 134-2 ¶ 129.  Specifically, Greg Bayard, the co-founder of Parallel Housing, testified Fred Graham, the City Attorney, told him that Mayor Toms instructed Graham not to work on the DNR grant conversion.  Doc. 102 at 61:20-62:13.  But as the court concluded in *Hallmark*, "there is no context that renders" the Mayor's purported direction to Fred Graham "suspect."  466 F.3d at 1285.  The City's decision to stop pursuing a conversion of the Perkins Field property is explainable "as a response to community concern."  *Id*.  And "with no racial animus expressed" to City Council, "there is nothing inherently wrong with responding to community pressure."  *Id*.  Thus, this factor does not provide circumstantial evidence of discriminatory intent.

In sum, the plaintiffs have failed to create a triable issue of fact as to whether the City intentionally discriminated on the basis of race when it rescinded the Commitment Resolution.  The plaintiffs rely on ambiguous statements and circumstances to support their contention that the City acted with racially discriminatory intent.  While the Court is required to draw all reasonable inferences in the plaintiffs' favor, "an inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing*

*Home*, 692 F.2d 1321, 1324 (11th Cir. 1982).  The plaintiffs have not come forward with specific facts demonstrating that race influenced the City's decision to rescind the Commitment Resolution.  There is no evidence, circumstantial or direct, that the City acted to ratify the alleged racial motivations of the community and, as a result, the *Hallmark* factors do not provide evidence of discriminatory intent.

Because Perkins LP and Woda Cooper have not created a triable issue concerning the City's discriminatory intent, the City's motion for summary judgment (Doc. 100) on the disparate treatment claim is **GRANTED**.[23]

## D. Retaliation Claim

The FHA's antiretaliation provision states that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."  42 U.S.C. § 3617.  Thus, "[a] retaliation claim under the [FHA] requires proof of three elements: (1) that the plaintiff was engaged in an activity protected by the [FHA]; (2) that the defendant took

---

[23] The plaintiffs contend that, on the merits, their retaliation claim can survive "whether or not the" disparate treatment claim "succeed[s] or fail[s]."  Doc. 98-1 at 2.  Again, the parties do not address standing specifically in the context of the retaliation claims.  Eleventh Circuit caselaw demonstrates that a plaintiff can assert a retaliation claim under 42 U.S.C. § 3617 even if no other FHA provision is violated.  *See Philippeaux v. Apartment Inv. & Mgmt. Co.*, 598 F. App'x 640, 644 (11th Cir. 2015) ("A plaintiff engages in statutorily protected activity when he or she protests conduct which is actually lawful, so long as he or she demonstrates a good faith, reasonable belief that the conduct engaged in was unlawful.") (cleaned up) (quoting *Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998)); *see also Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir. 1999) ("[A]n employee need not prove the underlying claim of discrimination in order to establish a retaliation claim."); *Stackhouse v. DeSitter*, 620 F. Supp. 208, 210 (N.D. Ill. 1985) ("[R]eading § 3617 as dependent on a violation of the enumerated sections would render § 3617 superfluous."); *Smith v. Stechel*, 510 F.2d 1162, 1164 (9th Cir. 1975) ("[Section 3617] deals with a situation where no discriminatory housing practice may have occurred at all because the would-be tenant has been discouraged from asserting his rights, or because the rights have actually been respected by persons who suffer consequent retaliation.").

some adverse action against the plaintiff; and (3) that a causal connection existed between the protected activity and the adverse action." *N.A.A.C.P. v. City of Kyle, Tex.*, 2009 WL 6574497, at *4 (W.D. Tex. Mar. 20, 2009), *aff'd,* 626 F.3d 233 (5th Cir. 2010); *Philippeaux*, 598 F. App'x at 644 (citing *Walker*, 272 F.3d at 1128).

The plaintiffs contend that defense counsel's statements during Woda Cooper's Rule 30(b)(6) deposition and the follow-up emails were made in retaliation for the plaintiffs' exercise of their FHA rights.  Doc. 98-1 at 2-3.  The City argues these statements were nonretaliatory and part of a legitimate defense strategy.  Doc. 133 at 12.  Both parties move for summary judgement on the plaintiffs' retaliation claim.  Docs. 98; 100.

   1. *The plaintiffs have direct evidence of retaliatory action.*

The plaintiffs have produced direct evidence of retaliatory action sufficient to raise a genuine issue material fact as to whether the City retaliated against them for exercising their FHA rights.  "Direct evidence … is evidence that, if believed, proves the existence of a fact without inference or presumption."  *Dixon*, 627 F.3d at 854 (internal quotation marks and citation omitted).  "Evidence that only suggests [retaliation] or that is subject to more than one interpretation does not constitute direct evidence."  *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (internal citations omitted).  "In a long line of cases, [the Eleventh Circuit] has found direct evidence where actions or statements of [a defendant] reflect a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the [plaintiff]."  *Id.* (cleaned up).  For example, the Eleventh Circuit has held that the statement "[y]our deposition was the most damning to Dillard's case, and you no longer have a place here at Dillard Paper Company," was direct evidence of retaliation.  *Id.* at 1190.

Here, defense counsel accused the plaintiffs of perjury and stated the City was "not interested in exploring further settlement negotiations." Docs. 73 at 171:2-9, 179:24-25; 83-15 at 2. Further, "based upon documents and admissions made in this pending litigation," defense counsel informed the plaintiffs of his intent "to demand that DCA withdraw the 9% LIHTC award" and forward this information "to the Attorney General's Office and to the Fulton County District Attorney's Office for their review." Doc. 83-15 at 2.

First, to state the obvious, the plaintiffs' pursuit of their FHA claims was classic protected activity. Second, the alleged retaliatory action occurred during and as a part of the protected activity. As defense counsel put it, the statements were made "while mounting a vigorous defense of the claims against the City." Doc. 100-1 at 41. Third, a jury could find, on the face of the statements, that the statements were threats precipitated by the protected activity and were made to stop the protected activity. In other words, a jury could find that the clear import of the statements was to threaten criminal prosecution and a revocation of the LIHTC award, unless the plaintiffs dropped their FHA claims.

The City argues that the plaintiffs have "elected to engage in mind reading as to defense counsel's true reasons or motivations." Doc. 133 at 4. Defense counsel testified by affidavit that when he "asked the questions during Woda Cooper's [Rule] 30(b)(6) deposition and when [he] sent the email on July 5, 2022, stating [he] would be sharing facts and documents about the [p]laintiffs having lied under oath," he "was not at all thinking of fair housing retaliation" and that he "had no retaliatory motive." Doc.

100-27 ¶¶ 34-35.[24]  In other words, because defense counsel testified that his "motive" for the threats was not retaliatory, the City contends that the plaintiffs cannot prove retaliation.

If a defendant could defeat a retaliation claim simply by claiming the absence of retaliatory intent, no retaliation claim would get to a jury.  Of course, a jury could believe defense counsel and find that the threats were not retaliation for protected activity.  But given the nature and context of the threats, the City cannot establish as a matter of law that the threats were not retaliatory just because defense counsel claims he had no retaliatory intent.  Simply put, defense counsel's testimony goes to credibility and the weight of the evidence, issues for the factfinder, not this Court.  *Anderson*, 477 U.S. at 255.

*2. The plaintiffs have circumstantial evidence of retaliatory action.*

But even if defense counsel's statements were not direct evidence of retaliation, the plaintiffs provide circumstantial evidence of retaliatory action.

When a retaliation claim is based on circumstantial evidence, the Court applies the *McDonnell Douglas* burden-shifting framework.  *Raney*, 120 F.3d at 1196.  Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation.  411 U.S. at 802.  If a plaintiff establishes a prima facie case of retaliation, the burden of production, but not the burden of persuasion, shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse action.  *Tex. Dep't of Cmty. Affairs v.*

---

[24] The plaintiffs object to defense counsel's affidavit "as inadmissible since: it contains additional legal arguments; it contains conclusions and not facts; and it contains undisclosed, paid purported expert testimony after the deadline for discovery has closed."  Doc. 134 at 41-42.  However, the plaintiffs do not object to the affidavit as evidence of defense counsel's reasons for making the alleged retaliatory statements.  *Id.*

*Burdine*, 450 U.S. 248, 254-56 (1981).  This burden of production means the defendant "need not persuade the court that it was *actually* motivated by the proffered reasons," but must produce evidence sufficient to raise a genuine issue of fact as to whether it retaliated against the plaintiff.  *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (internal quotation marks and citation omitted).

A plaintiff can then show that the defendant's stated reason is in fact pretext for retaliation.  *Id*.  This may be done "either directly by persuading the court that a [retaliatory] reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence."  *Id*.  (quoting *Burdine*, 450 U.S. at 256).  A plaintiff can "do this by pointing to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the proffered explanation."  *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)).  "If the [defendant] proffers more than one legitimate, [nonretaliatory] reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment."  *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).  And where "a plaintiff produces sufficient evidence that the [defendant's] proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the [defendant]."  *Kragor*, 702 F.3d at 1309.

        a. Prima Facie Case

"To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action;

and (3) a causal link exists between the protected activity and the adverse action."
*Philippeaux*, 598 F. App'x at 644 (quoting *Walker*, 272 F.3d at 1128).

The parties do not dispute that the plaintiffs engaged in protected activity—the plaintiffs' pursuit of their FHA claims.  Docs. 98-1 at 7-8; 100-1 at 36-43.  However, the City contends that the plaintiffs fail to demonstrate a prima facie case because there was no adverse action and no causal connection.  Doc. 100-1 at 36-41.  Alternatively, the City argues that defense counsel's actions are not attributable to the City for purposes of vicarious liability under the FHA.  *Id*.  The Court disagrees.

### i. Adverse Action

The City argues that because defense counsel's threats were "not carried out" there was no adverse action.  Docs. 100-1 at 38-39; 133 at 8-11.  That argument ignores the plain language of § 3617, which makes it unlawful to "coerce, intimidate, *threaten*, or interfere" with any person on account of his having exercised FHA rights. 42 U.S.C. § 3617 (emphasis added).  Additionally, the City claims that because the plaintiffs were not deterred from pursuing their FHA claims there was no adverse action. Docs. 100-1 at 37-38; 133 at 9-10.  But the question is whether a *reasonable* person would be deterred from engaging in protected activity.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  The fact that the *plaintiffs* were not deterred is not dispositive.  A jury could reasonably find that threatening criminal investigation and the revocation of a multimillion-dollar grant award would deter a reasonable person from engaging in protected activity.  *See Bone v. Vill. Club, Inc.*, 223 F. Supp. 3d 1203, 1219  (M.D. Fla. 2016).

The City's real argument, it seems, is that the plaintiffs have not been damaged, not that there was no adverse action.  Doc. 100-1 at 38.  But the City does not dispute that the plaintiffs can seek equitable relief, thus the Court cannot.  As for damages, the briefs provide more questions than answers.  Those issues will have to be sorted out later.  One thing is undisputed—the plaintiffs have suffered no economic or special damages as a result of the alleged retaliation.  Docs. 100-2 ¶¶ 425-29; 134-2 ¶¶ 425-29; 145 at 4.[25]  The City moves for summary judgment on that point.  Doc. 100-1 at 36.  The City's motion (Doc. 100) to that extent is granted.

Next, the City argues that "the valid pursuit of legal rights" and "mounting a vigorous defense" cannot constitute a violation of § 3617.  Doc. 133 at 12.  Certainly, "mounting a vigorous defense" is not retaliation for protected activity.  For example, if a defendant believes a plaintiff's claims are frivolous, a defendant can properly raise that issue.  *See, e.g.*, Fed. R. Civ. 11.  Few would think, however, that threatening criminal prosecution in the "vigorous defense" of a civil action is proper.  *See* Ga. R. Prof. Cond. 3.4; *Cohen v. Rogers*, 341 Ga. App. 146, 173, 798 S.E.2d 701, 719 (2017) ("Criminal charges may not be used as bargaining chips in negotiations about civil cases.") (McFadden, J., concurring in part); *see also Suchite v. Kleppin*, 819 F. Supp. 2d 1284, 1294 (S.D. Fla. 2011) (holding that the defendants' threat to report the plaintiffs to the United States Attorney's Office for prosecution constituted adverse action).  The Court cannot find as a matter of law that the alleged threats are not actionable.

---

[25] The plaintiffs dispute the City's statement that they "have no damages for reputational harm arising from [their] claim for fair housing retaliation" because "as of the date of the depositions" the plaintiffs "have no damages," but this "could change if [the City] carries out its retaliatory threats."  Doc. 134-2 ¶ 425.  In any event, it is undisputed that currently the plaintiffs have no economic damages for reputational harm.

### ii. Causal Connection

A plaintiff must also demonstrate that the adverse action by the defendant is "on account of" the plaintiff's protected activity and not some other reason. *Fisher v. SP One, Ltd.*, 559 F. App'x 873, 877 (11th Cir. 2014) (quoting 42 U.S.C. § 3617). As the Supreme Court has observed, "on account of" has the same textual meaning as "because of" and requires the plaintiff to prove their protected activity was the but-for cause of the adverse action. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation."); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) ("The words 'because of' mean 'by reason of: on account of.'"). "[A] but-for test directs [the court] to change one thing at a time and see if the outcome changes. If it does, [the court has] found a but-for cause." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739 (2020).

Defense counsel testified that the deposition statements and subsequent emails were part of the City's "defense strategy." Doc. 100-27 ¶¶ 27, 29. As a result, a reasonable jury could conclude that "but-for" the plaintiffs' FHA claims, defense counsel would not have made the threatening statements. *See Suchite*, 819 F. Supp. 2d at 1294 ("If the Plaintiffs had not brought cases in an attempt to vindicate their FLSA rights, then the Defendants would not have urged the courts in those cases to refer Plaintiffs to the United States Attorney's Office.").

### iii. Vicarious Liability

Alternatively, the City argues that defense counsel was an "independent contractor," and thus, the City cannot be liable under the FHA for defense counsel's

conduct.  Doc. 133 at 17-19 (citing *McCall v. Montgomery Hous. Auth.*, 2022 WL 683081 (11th Cir. Mar. 8, 2022)).  Traditional vicarious liability rules apply to FHA claims.  *Meyer v. Holley*, 537 U.S. 280, 285 (2003).  And these rules "ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment."  *Id*.  Lawyers are considered agents of their clients.  *See Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911, 916 (11th Cir. 1982) ("In our legal system, an attorney is his client's agent and representative; the client retains ultimate authority over the conduct of litigation.").

While a client is not always responsible for the acts of his or her attorney, the facts illustrate that defense counsel was acting within the scope of the authority given to him by the City.  Defense counsel testifies that his conduct was part of the "defense strategy."  Doc. 100-27 ¶ 29.  And defense counsel's threats were made simultaneous with the City's decision to withdraw from settlement negotiations.  Doc. 83-15 at 2.  Thus, the City's attempt to convince the Court, as a matter of law, that "neither the Mayor or City Council have directed [defense counsel's] work or defense strategies" is unavailing considering the Rules of Professional Conduct require lawyers to "consult with the client about the means by which the client's objectives are to be accomplished" and to "abide by a client's decision whether to settle a matter."  Doc. 100-27 ¶ 3; Ga. R. Prof. Cond. 1.4(a)(2), 1.2(a).[26]

---

[26] The City's reliance on *McCall* is also unpersuasive.  2022 WL 683081, at *3.  In *McCall*, the Eleventh Circuit concluded that the plaintiff's discrimination claim failed because she could not explain how "comments by a third-party inspector and a maintenance worker of a private apartment complex constitute discrimination on the basis of race by the Housing Authority and its executive director."  *Id*.  A lawyer is not a "third-party inspector" or "maintenance worker."  The City has not presented any evidence that it rejects defense counsel's strategies and tactics.  As a result, defense counsel was working within the scope of the lawyer-client agent relationship.

In sum, the plaintiffs make out a prima facie case of retaliation.  The burden now shifts to the defendants to articulate legitimate nonretaliatory reasons for engaging in the allegedly retaliatory conduct.

b. Legitimate Nonretaliatory Reasons

The City provides five reasons for making the statements at issue here.  Doc. 100-1 at 41-42.  First, "defense counsel was personally disturbed and upset to discover that Plaintiffs had knowingly and intentionally misrepresented the facts to DCA when they submitted their LIHTC application."  *Id*.  Second, defense counsel was "disturbed an[d] upset to learn that Plaintiffs continued to represent to DCA for years that they had a contract with the City when they knew all along that the City was never a party to any contract."  *Id*.  Third, defense counsel "believed … revealing the true facts surrounding this proposed development … were in the City's best interest in terms of the legal defense strategy for this case."  *Id*.  Fourth, defense counsel "wished to further explore" the defense of after-acquired evidence "through cross-examination of Plaintiffs' designated corporate representative."  *Id*.  Fifth, defense counsel "wanted to give Plaintiffs' counsel the courtesy of informing them of his intention" to forward the matter to the proper authorities.  *Id*.

These are not legitimate nonretaliatory reasons.  They are not separate and unrelated reasons for the alleged retaliatory action.  An example from the more typical retaliation claim illustrates this—"I did not fire the employee because he filed a Title VII claim; I fired him for excessive absences."  The City's claimed legitimate nonretaliatory reasons are really assertions of the lack of retaliatory intent.  Clearly, the argument that the threats were made because defense counsel was disturbed and upset is not a

-43-

legitimate nonretaliatory reason.  As the plaintiffs put it, "allowing such a subjective, amorphous basis for retaliatory behavior would allow any party to excuse any retaliatory action simply by claiming that he got mad at the victim's behavior."  Doc. 134 at 40.  And what is left unstated is why the threats were "necessary" to defense counsel's legal strategy.  No legitimate legal strategy requires the threat of criminal investigation—to hold otherwise would sanction violations of the Rules of Professional Conduct.  *See* Ga. R. Prof. Cond. 3.4.  Thus, the City has not met its burden to proffer legitimate nonretaliatory reasons for the deposition statements and emails.

> c. Pretext

Even if the City had met its burden to articulate legitimate, nonretaliatory reasons for the threats, the plaintiffs have created a genuine issue of material fact as to whether the proffered reasons are pretext for retaliation.

The City contends defense counsel's deposition statements and follow-up emails were a response to the plaintiffs' deception rather than retaliation for the exercise of their FHA rights.  Doc. 100-1 at 41.  While the plaintiffs admit that they did not have a warranty deed, legally binding contract, or long-term lease agreement with the City demonstrating site control, they contend that they never misrepresented this fact.  Docs. 100-2 ¶ 85; 134-2 ¶ 85.  Specifically, the DCA was aware that a future City Council vote was necessary to transfer the land from the City to the Development Authority and stated that this condition precedent "was accurately described in the [plaintiffs' LIHTC] application."  Doc. 111 at 133:4-7, 635.  As a result, the DCA considered the condition precedent in the lease agreement and concluded that the plaintiffs had site control over

the Perkins Field property notwithstanding the QAP definition.  Accordingly, the plaintiffs have presented evidence that the first and second reasons are pretext for retaliation.

Next, the City argues that the deposition statements and subsequent emails were necessary to "reveal[] the true facts surrounding this proposed development" and to pursue the defense strategy of after-acquired evidence.  Doc. 100-1 at 42.  While these may be legitimate legal strategies, what the City does not explain is how the threat of a criminal investigation and revocation of the LIHTC award were necessary to accomplish these strategies.  In fact, defense counsel later testified that after researching the issue, he "reached the opinion that the City did not have the requisite standing" to pursue a revocation of the LIHTC award.  Doc. 100-27 ¶ 43.  Thus, defense counsel's own testimony contradicts his purported justifications and the plaintiffs have presented evidence that the third and fourth reasons are pretext for retaliation.

Finally, the City argues the deposition statements and subsequent emails were not retaliatory because defense counsel "wanted to give Plaintiffs' counsel the courtesy of informing them of his intention" to forward the matter to the proper authorities.  Doc. 100-1 at 42.  The Court can discern no courtesy or good intentions in the threats.  And as the plaintiffs note, there is no requirement under federal or Georgia law that obligates a party to inform the other that a violation of a criminal statute has occurred.  Doc. 145 at 7.  Accordingly, the plaintiffs have demonstrated implausibilities, inconsistencies, and incoherencies for a jury to decide whether the fifth reason is pretext for retaliation.

In sum, defense counsel's efforts to explain *why* he threatened the plaintiffs with criminal investigation and a revocation of the LIHTC award does not change the fact that he threatened the plaintiffs.  Indeed, defense counsel's justifications confirm that

the threats were part of his defense strategy and a direct response to the plaintiff's pursuit of their FHA rights.  The plaintiffs have proffered sufficient evidence to raise a genuine issue of material fact as to whether defense counsel's statements were made in retaliation for the plaintiffs' exercise of their FHA rights.[27]  However, defense counsel's affidavit creates a fact issue as to his true motive for the deposition statements and follow-up emails.  Thus, no party is entitled to summary judgment, except on the issue of economic and special damages.  Accordingly, the City's motion for summary judgment on the plaintiffs' retaliation claim (Doc. 100) is **GRANTED in part** and **DENIED in part** and the plaintiffs' partial motion for summary judgment (Doc. 98) is **DENIED**.

## IV. CONCLUSION

Plaintiffs Parallel Housing and Parallel Development LLC lack standing to assert a disparate treatment claim.  Plaintiffs Perkins LP and Woda Cooper have failed to create a triable issue of fact as to whether the City intentionally discriminated on the basis of race when it rescinded the Commitment Resolution.  However, defense counsel's deposition statements and follow-up emails create a triable issue of fact on the question of whether the City retaliated against the plaintiffs for the exercise of their FHA rights.

Accordingly, the City's motion summary judgment (Doc. 100) is **GRANTED in part** and **DENIED in part** and the plaintiffs' motion for summary judgment (Doc. 98) is **DENIED**.  The plaintiffs' disparate treatment claim is **DISMISSED** but the plaintiffs'

---

[27] Finally, defense counsel's statements create a convincing mosaic of evidence that could lead a reasonable jury to conclude the plaintiffs were the subject of retaliation.  *Sims*, 704 F.3d at 1333; *Smith*, 644 F.3d at 1328.

retaliation claim shall proceed to trial.  Additionally, the City's motion to exclude the plaintiffs' expert (Doc. 99) is **DENIED** as moot.  For the retaliation claim, standing and damages issues remain to be resolved.

   **SO ORDERED**, this 13th day of June, 2023.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
